UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 10/22/2024
```

-------------------------------------------------------------------X
:
JESSY MANGAHAS, and PITCHAYA WOHLFAHRT,    :
*on behalf of themselves and all others similarly situated,*    :
:
Plaintiffs,    :    22-cv-4150 (LJL)
:
-v-    :    OPINION AND ORDER
:
EIGHT ORANGES INC. d/b/a THE BAO, CHIBAOLA    :
INC. d/b/a ULUH, JOANNE HONG BAO, and    :
RICHARD LAM,    :
:
Defendants.    :
:
-------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

    This matter is before the Court on cross-motions for summary judgment. Class Representatives Jessy Mangahas ("Mangahas") and Pitchaya Wohlfahrt ("Wohlfahrt," and together with Mangahas "Class Representatives" or "Named Plaintiffs") bring this action against Defendants Eight Oranges Inc. ("Eight Oranges"), doing business as The Bao ("The Bao"), Chibaola, Inc. ("Chibaola"), doing business as Uluh ("Uluh"), Joanne Hong Bao ("Hong Bao"), and Richard Lam ("Lam", and together with The Bao, Uluh, and Hong Bao, "Defendants"), alleging violations of the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL"). Dkt. No. 84.

    Class Representatives move on behalf of themselves and a certified class of servers, runners, bussers, bartenders, and barbacks that work or have worked at The Bao or Uluh after October 5, 2015 ("Plaintiffs") for partial summary judgment pursuant to Federal Rule of Civil Procedure 56. Dkt. No. 121. Plaintiffs ask the Court to determine as a matter of law that: (1) Plaintiffs were employees of Defendants, and Defendants are governed by the FLSA and

NYLL; (2) The Bao and Uluh operate as a single integrated enterprise; (3) Lam and Hong Bao are individually liable; (4) Defendants failed to provide proper notice of the tip credit to Plaintiffs and other tipped workers; (5) Defendants violated the FLSA and NYLL by instituting unlawful tip pools at the restaurants that included management; (6) differential damages for the tip credit should be awarded based on payroll records; (7) damages should be awarded for the unpaid tips; (8) Defendants violated the NYLL's prohibition on excessive side work; (9) Defendants violated the NYLL's uniform reimbursement requirements; (10) Defendants violated the wage theft prevention act that requires proper wage notices and accurate wage statements; and (11) Defendants will be unable to show their good faith affirmative defense. *Id.*

Defendants move for partial summary judgment pursuant to Federal Rule of Civil Procedure 56. Dkt. No. 125. Defendants ask the Court to determine as a matter of law that summary judgment should be granted in favor of Hong Bao because she was not an employer under FLSA and NYLL.

For the following reasons, Defendants' motion is denied and Plaintiffs' motion is granted in part and denied in part.

## BACKGROUND

Plaintiffs claim that Defendants violated the overtime, minimum wage, and tip credit provisions of the FLSA, and the overtime, minimum wage, tip credit, uniform reimbursement, spread of hours, wage notice, and wage statement provisions of the NYLL.[1]

The following facts are undisputed unless otherwise stated. They are construed in favor of the non-moving party.

---

[1] Plaintiffs' allegations are further described in the Court's previous opinions in this action. *See Mangahas v. Eight Oranges Inc.*, 2022 WL 10383029 (S.D.N.Y. Oct. 18, 2022); *Mangahas v. Eight Oranges Inc.*, 2023 WL 3170404 (S.D.N.Y. May 1, 2023); *Mangahas v. Eight Oranges Inc.*, 2024 WL 2801922 (S.D.N.Y. May 31, 2024); Dkt. No. 44.

The Bao and Uluh are two New York restaurants that serve Chinese-influenced cuisine. Dkt. No. 138 ¶¶ 7–9.  Both The Bao and Uluh employ front-of-house workers such as servers and bussers and offer in-person seating for customers.  *Id.* ¶ 17.  The Bao can seat approximately 60 customers, while Uluh can seat approximately 70 customers.  *Id.*  In addition, shortly after the Covid-19 pandemic, The Bao set up a temporary outdoor dining space.  *Id.* ¶ 17.  Uluh had a larger outdoor space that remained open to customers in the summers after the pandemic.  *Id.*  Both restaurants operate seven days a week and are open approximately ten and a half hours per day on weekdays and eleven hours per day on weekends.  *Id.* ¶ 18.

Defendant Eight Oranges is the corporate entity that operates The Bao; Defendant Chibaola is the corporate entity that operates Uluh.  *Id.* ¶¶ 10–11.  Defendant Lam is the current 100% shareholder of Eight Oranges and Chibaola.  Dkt. No. 124 at 5 (citing Dkt. No. 122-32 at 11:17– 19); Dkt. No. 139 at 6 (same).  Lam identifies himself as owner and operator of the restaurants and is listed as president in the corporate documents for each.  Dkt. No. 138 ¶ 35.  Defendant Hong Bao is Lam's wife.  Dkt. No. 138 ¶ 36; Dkt. No. 136 ¶ 7.  Hong Bao performs a "quality control" role at both restaurants.  Dkt. No. 138 ¶ 37.  She does not speak English fluently.  Dkt. No. 136 ¶ 17; Dkt. No. 138 ¶ 41.

The restaurants are two blocks away from one another.  Dkt. No. 138 ¶ 8.  Uluh's basement (the "Office") operates as a central office for both restaurants that stores corporate payroll, tax, timecards, and other corporate records for Uluh and The Bao.  *Id.* ¶ 19.  Lu Mei Zhang ("Zhang") served as the general manager for both restaurants and worked out of the Office.  *Id.* ¶¶ 19–20. The two restaurants additionally used the same accountant for payroll purposes.  *Id.* ¶ 21.

Tipped employees were sometimes instructed to split their time between The Bao and Uluh.  Dkt. No. 124 at 3–4; Dkt. No. 139 at 4; *see* Dkt. No. 122-10 at 55:22–60:10; Dkt. No. 122-

11 at 33:11–14; Dkt. No. 122-15 at 51:16–24; Dkt. No. 122-16 at 47:4–48:12; Dkt. No. 132-1 at 62:11–63:10; Dkt. No. 122-18 at 54:3–21; Dkt. No. 122-19 at 30:2–31:5.  Defendants however argue that such employees "were sent to work between The Bao and Uluh against the two companies' polices, against Lam's orders, and without Lam's knowledge."  Dkt. No. 139 at 4; *see* Dkt. No. 126-7 at 98:11–99:8.  Tipped workers additionally performed "side work" such as cleaning and food preparation as part of their regular duties.  Dkt. No. 138 ¶ 71.

Both restaurants had team leaders whose responsibilities included hiring, firing, disciplining, scheduling, promoting, determining what percentage of the employee tip pool individual employees received, handling the tip sheet, accessing company email accounts, and creating policies and the handbook.  Dkt. No. 138 ¶ 67.  Team leaders participated in the tip pool at both The Bao and Uluh and received a larger percentage of tips than other tipped employees. *Id.* ¶¶ 66, 68.  In addition to serving as general manager of the two restaurants, Zhang served as one of these team leaders, and it was she who created the tip pooling arrangement at both restaurants.  *Id.* ¶¶ 65, 69.  Defendants applied a tip credit toward the wages they paid tipped workers at the restaurants.  Dkt. No. 138 ¶ 33.

Tipped workers at both restaurants wore uniform tops emblazoned with the respective restaurant's logo.  *Id.* ¶¶ 85–86.  Defendants charged workers somewhere between $10 and $25 as a deposit for the tops.  *Id.*  Defendants' policy was that deposits would be returned to employees after the uniforms were returned, but the offer to return the deposit was not communicated to all Plaintiffs and not all Plaintiffs who returned their uniforms received their deposits back.  *Id.* ¶¶ 87–89.

## PROCEDURAL HISTORY

This action was initiated by complaint filed on May 20, 2022.  Dkt. No. 1.  On August 18, 2022, Mangahas filed the first amended complaint.  Dkt. No. 25.  On September 1, 2022, all

Defendants answered the first amended complaint, Dkt. No. 32, and Defendant Hong Bao filed a motion to dismiss the first amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, Dkt. No. 28. On October 18, 2022, the Court denied Hong Bao's motion to dismiss and granted Mangahas's motion for conditional certification of the case as a collective action. Dkt. Nos. 43–44. On May 4, 2023, Mangahas and Wohlfahrt filed the operative second amended complaint. Dkt. No. 84. All Defendants submitted an answer to the second amended complaint on May 18, 2023. Dkt. No. 85. On December 7, 2023, Named Plaintiffs moved for class certification. Dkt. Nos. 92–94.

On April 22, 2024, Named Plaintiffs moved for partial summary judgment. Dkt. No. 121. Named Plaintiffs filed a supporting declaration, memorandum of law, and a Local Rule 56.1 statement. Dkt. Nos. 122–124. On May 20, 2024, Defendants filed a counterstatement to Named Plaintiffs' Local Rule 56.1 statement, a declaration, and a memorandum of law in opposition to Defendants' motion for partial summary judgment. Dkt. Nos. 138–140. Named Plaintiffs filed a reply memorandum of law in support of partial summary judgment on May 30, 2024. Dkt. No. 141.

On April 22, 2024, Defendants moved for partial summary judgment. Dkt. No. 125. Named Plaintiffs filed a supporting affirmation, two declarations, a memorandum of law, and a Local Rule 56.1 statement. Dkt. Nos. 126–130, 132. On May 20, 2024, Named Plaintiffs filed a counterstatement to Defendants' Local Rule 56.1 statement, a declaration, and a memorandum of law in opposition to Defendants' motion for partial summary judgment. Dkt. Nos. 135–137. Defendants did not file a reply memorandum of law.

On May 31, 2024, the Court granted Named Plaintiffs' motion for class certification and certified a class consisting of servers, runners, bussers, bartenders, and barbacks that work or have

worked at The Bao or Uluh after October 5, 2015.  Dkt. No. 142.  The Court appointed class counsel, authorized notice of class members, and appointed Mangahas and Wohlfahrt as Class Representatives.  *Id.*  On August 9, 2024, the Court approved the parties' proposed alternative notice. Dkt. No. 150.  The opt-out period ended October 21, 2024. Dkt. No. 157.  Four individuals requested exclusion from the class.  Dkt. Nos. 158–159.  A bench trial is scheduled for December 2, 2024.  July 16, 2024 Minute Entry.

## LEGAL STANDARDS

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In determining whether there are any genuine issues of material fact, the Court must view all facts "in the light most favorable to the non-moving party," *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008), and the movant bears the burden of demonstrating that "no genuine issue of material fact exists," *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary

judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).  Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  To defeat a motion for summary judgment, the non-moving party must demonstrate more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible."  *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted). "Mere conjecture or surmise by the nonmovant in support of his or her case is inadequate."  *Am. Home Assurance Co. v. Jamaica*, 418 F. Supp. 2d 537, 546 (S.D.N.Y. 2006).

"'[W]here the moving party has the burden—the plaintiff on a claim for relief or the defendant on an affirmative defense—his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.'"  *Liberty Mut. Ins. Co. v. Sterling Ins. Co.*, 632 F. Supp. 3d 83, 88 (E.D.N.Y. 2022) (quoting *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986)); *accord Hart v. Rick's Cabaret Int'l, Inc.*, 60 F. Supp. 3d 447, 476 (S.D.N.Y. 2014)  "Where a plaintiff uses a summary judgment motion, in part, to challenge the legal sufficiency of an affirmative defense—on which the defendant bears the burden of proof at trial—a plaintiff 'may satisfy its Rule 56 burden by showing that there is an absence of evidence to support [an essential element of] the [non-moving party's] case.'"  *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *DiCola v. SwissRe Holding (N. Am.), Inc.,* 996 F.2d 30 (2d Cir. 1993)).  "[T]here is 'no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim.'"  *Id.*

(quoting *Celotex,* 477 U.S. at 323).  In that instance, "a non-moving party must have some evidence permitting a reasonable juror to find in its favor with respect to an affirmative defense."  *In re 650 Fifth Ave. & Related Props.*, 830 F.3d 66, 97 n.29 (2d Cir. 2016).

Local Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York prescribes the manner and method in which a party is to present undisputed issues of fact to the Court.  The moving party must annex to its notice of motion "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  Local Rule 56.1(a). The party opposing the motion for summary judgment is required to "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party."  Local Rule 56.1(b).[2]  The statements "must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."  Local Rule 56.1(d).  The consequences of failure to follow these rules can be severe.  "Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."  Local Rule 56.1(c).

Thus, a Local Rule 56.1 statement "is not itself a vehicle for making factual assertions that are otherwise unsupported in the record."  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001).  If portions of a Local Rule 56.1 counterstatement cite to no admissible evidence in support

---

[2] Local Rule 56.1 was amended effective July 1, 2024, after all Rule 56.1 statements and counterstatements were submitted in this action.  The wording of Local Rule 56.1 set forth here is the wording at the time the statements were submitted, which differs slightly from the wording of the current rule.

of its denials, the Court is instructed to disregard those portions and deem the factual statements in the original Local Rule 56.1 statements admitted.  *See, e.g.*, *Cayemittes v. City of N.Y. Dep't of Hous. Pres. & Dev.*, 974 F. Supp. 2d 240, 243 (S.D.N.Y. 2013) (holding that denials that are not supported by citations to admissible record evidence are to be disregarded).  When the non-moving party in certain instances fails to cite to any record evidence for its denials, the Court accepts the moving party's characterization of those facts in its Local Rule 56.1 statement as undisputed.  *See Colton v. N.Y. Div. of State Pol.*, 2017 WL 5508911, at *2 (N.D.N.Y. Feb. 8, 2017) ("The failure to properly controvert a supported statement of fact by pointing to admissible evidence contravening the movant's evidence results in the movant's statement being deemed admitted."); *Knight v. N.Y.C.H.A.*, 2007 WL 313435, at *1 (S.D.N.Y. Feb. 2, 2007) ("Pursuant to Local Civil Rule 56.1 Defendant's statements are deemed to be admitted where Plaintiff has failed to specifically controvert them with citations to the record.").

Where "class claims all derive from the same compensation policies and tipping practices," *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 252 (2d Cir. 2011), it follows that evidence of those policies and practices will apply to the whole class.  *See also Youngblood v. Fam. Dollar Stores, Inc.*, 2011 WL 4597555, at *4 (S.D.N.Y. Oct. 4, 2011) ("[T]he crux of this case is whether the company-wide policies, as implemented, violated Plaintiffs' statutory rights"); *Espinoza v. 953 Assocs. LLC*, 280 F.R.D. 113, 130 (S.D.N.Y. 2011) (similar).  Accordingly, courts can and do grant or deny summary judgment on a classwide basis.  *See, e.g.*, *Torres v. Gristede's Operating Corp.*, 628 F. Supp. 2d 447 (S.D.N.Y. 2008) (partially granting summary judgment in FLSA case); *Martineko v. 212 Steakhouse, Inc.*, 2024 WL 3928849 (S.D.N.Y. Aug. 13, 2024) (recommending classwide partial summary judgment in FLSA and labor law case); *Balderramo v. Go N.Y. Tours Inc.*, 668 F. Supp. 3d 207 (S.D.N.Y. 2023) (granting summary judgment on NYLL

wage notice and overtime claims); *Hart*, 60 F. Supp. 3d 447 (granting summary judgment on claims for FLSA and NYLL minimum wage violations, NYLL retained gratuities, and NYLL fines and fees). To obtain summary judgment, plaintiff must establish that there is no genuine dispute as to an unlawful labor law practice that applies classwide. *See Martineko*, 2024 WL 3928849, at *17 ("Summary judgment should be granted on Plaintiffs' minimum wage claim based on Defendants' unlawful use of a tip credit because there is no genuine dispute that Defendants paid class members pursuant to a tip credit without providing the required written notice."); *Hart*, 60 F. Supp. 3d at 462. Plaintiff may offer direct evidence of a classwide policy or practice. *See Balderramo*, 668 F. Supp. 3d at 239 (granting summary judgment where defendant "admitt[ed] to not paying its drivers one and one half times their regular rates for overtime hours worked"); *cf. Hinterberger v. Cath. Health Sys.*, 299 F.R.D. 22, 40–41 (W.D.N.Y. 2014) (internal company documents were insufficient to establish a classwide policy where they pertained to only certain departments, worksites, or facilities). A court can also conclude that an entire class of employee plaintiffs have suffered a classwide violation "based on the testimony of a representative sample" of class members. *Reich v. S. New Eng. Telecomms. Corp.*, 121 F.3d 58 (2d Cir. 1997).[3] The appropriateness of representative testimony hinges on its representative qualities. "Generally speaking, the use of representative testimony is best reserved for situations where (1) the 'testimony covered each clearly defined category of worker;' (2) there is 'actual consistency among those workers' testimony, both within each category and overall;' (3) defendants offer 'no

---

[3] The parties concur "that proof by representative sample in FLSA/NYLL actions [is] commonplace and appropriate to determine liability in the Second Circuit." Dkt. No. 139 at 13; *see* Dkt. No. 124 at 16–17. Indeed, even outside of the context of the FLSA and NYLL, "[t]here is nothing novel about allowing representative testimony to be used in the context of multi-plaintiff litigation." *Wilson*, 2023 WL 8817150, at *4. The factfinder is ordinarily permitted to consider the testimony of one plaintiff to the extent it is probative of another plaintiff's claims. *Id.*

contradictory testimony;' (4) 'the abuse arose from an admitted policy of the employer that was consistently applied;' and (5) the time periods for which pay is at issue 'are predictable, daily-recurring periods of uniform and predetermined duration.'" *Remache v. Mac Hudson Grp.*, 2018 WL 4573072, at *7 (E.D.N.Y. Sept. 7, 2018) (default judgment) (quoting *Reich*, 121 F.3d at 68), *report and recommendation adopted*, 2018 WL 4568860 (E.D.N.Y. Sept. 24, 2018).  Defendants may defeat summary judgment by showing that there is a genuine issue whether the classwide policy violates the law.  *E.g.*, *Mendez v. Radec Corp.*, 232 F.R.D. 78, 89 (W.D.N.Y. 2005) (denying summary judgment where there was a genuine issue of fact as to whether bonus payments fell into a legal exceptions for discretionary bonuses under 29 C.F.R. §§ 778.208, 778.211(b)); *Balderramo*, 668 F. Supp. 3d at 228 (denying summary judgment on timely wages claim because, where plaintiffs were found not to be manual workers, defendant's pay policy did not violate NYLL § 191(1)(a).  Defendants may also defeat summary judgment by showing that there is a material difference among the testimony of the employee class members such that a genuine issue of fact is created for trial as to whether there was a classwide policy at all.  *See Hinterberger*, 299 F.R.D. at 42.   Evidence of the lack of a classwide policy could also, in certain cases, lead to decertification of the class.  *See, e.g.*, *In re Amla Litig.*, 320 F. Supp. 3d 578, 591 (S.D.N.Y. 2018).

Here, a total of 14 Plaintiffs sat for depositions, representing a sample size of more than 10.8% of the 129 putative class members Plaintiffs previously identified.  Dkt. No. 138 ¶ 6; Dkt. No. 93-14.  As discussed below, although there are differences between the testimony of the Plaintiffs, none of those differences is material.  In addition, with limited exceptions, the testimony and exhibits offered by Defendants, including of Defendants themselves, fail to create a genuine issue of fact for trial.

**DISCUSSION**

Plaintiffs ask the Court to rule that, as a matter of law: (1) Plaintiffs were employees of Defendants, and Defendants are governed by the FLSA and NYLL; (2) The Bao and Uluh operate as a single integrated enterprise; (3) Lam and Hong Bao are individually liable; (4) Defendants failed to provide proper notice of the tip credit to Plaintiffs and other tipped workers; (5) Defendants violated the FLSA and NYLL by unlawfully including management in the tip pools at the restaurants; (6) differential damages for the tip credit should be awarded based on payroll records; (7) damages should be awarded for the unpaid tips; (8) Defendants violated the NYLL's prohibition on excessive side work; (9) Defendants violated the NYLL's uniform reimbursement requirements; (10) Defendants violated the wage theft prevention act that requires proper wage notices and accurate wage statements; and (11) Defendants acted willfully and thus will be unable to show their good faith affirmative defense.  Dkt. No. 124.

Defendants seek summary judgment solely on the issue of whether Hong Bao was an employer under FLSA and NYLL.  Dkt. No 139.

## I.    Eight Oranges and Chibaola are Governed by the FLSA and NYLL

Defendants do not dispute that Eight Oranges and Chibaola are employers in the hospitality industry and are covered employers under the FLSA and NYLL.  Dkt. No. 122-9 ¶¶ 1–2. Defendants additionally do not dispute that the restaurants are covered by the New York State Hospitality Wage Order ("Hospitality Wage Order").  Dkt. No. 139 at 14.  Finally, Defendants do not dispute that class members who performed work at The Bao are covered employees of Eight Oranges under the FLSA and NYLL and class members who performed work at Uluh are covered employees of Chibaola under the FLSA and NYLL.  Dkt. No. 122-9 ¶¶ 3–4.

The elements for a prima facie case under the FLSA and NYLL are met regarding Eight Oranges and Chibaola and no reasonable jury could find otherwise.  Dkt. No. 124 at 17; Dkt. No. 139 at 14.  Summary judgment is therefore granted on this issue.

## II.    Single Integrated Enterprise

Plaintiffs argue that The Bao and Uluh should be considered a single integrated enterprise for the purposes of the FLSA and NYLL.  Dkt. No. 124 at 18–21.

"District courts have applied the single integrated enterprise test to assess whether a group of distinct but closely affiliated entities should be treated as a single employer for FLSA purposes." *Keawsri v. Ramen-Ya Inc.*, 2021 WL 3540671, at *10 (S.D.N.Y. Aug. 10, 2021) (punctuation omitted) (citing *Stewart v. Hudson Hall LLC*, 2020 WL 8732875, at *5 (S.D.N.Y. Oct. 19, 2020)). "Where the single-integrated-enterprise theory applies, courts may impose liability for a violation 'not only on the nominal employer but also on another entity comprising part of the [single] integrated employer.'"  *Huer Huang v. Shanghai City Corp.*, 459 F. Supp. 3d 580, 586 (S.D.N.Y. 2020) (quoting *Arculeo v. On-Site Sales & Mktg, LLC*, 425 F.3d 193, 198 (2d Cir. 2005)).

To determine "whether multiple defendants constitute a single employer, courts consider the following factors: (1) interrelation of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership or financial control."  *Perez v. Westchester Foreign Autos, Inc.*, 2013 WL 749497, at *7 (S.D.N.Y. Feb. 28, 2013) (citing *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1240 (2d Cir. 1995)); *see Juarez v. 449 Rest., Inc.*, 29 F. Supp. 3d 363, 367 (S.D.N.Y. 2014) (Nathan, J.).  "Although no one factor is determinative . . . control of labor relations is the central concern."  *Murray v. Miner*, 74 F.3d 402, 404 (2d Cir. 1996); *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 227 (2d Cir. 2014) (same).

The interrelation-of-operations factor concerns in large part "whether the entities share employees, services, records, and equipment."  *Dobrosmylov v. DeSales Media Grp., Inc.*, 532 F.

Supp. 3d 54, 62 (E.D.N.Y. 2021) (citation omitted); *see Brown*, 756 F.3d at 228 ("[T]he very system of assigning employees from one company to work for a period of years at another company suggests a significant degree of interrelated operations."); *Chica v. Shallu Constr. Corp.*, 2022 WL 970744, at *5 (E.D.N.Y. Mar. 31, 2022); *Keawsri*, 2021 WL 3540671, at *10 (restaurants had interrelated operations where "servers were transferred from one restaurant to the other"); *Chen v. Hunan Manor Enter., Inc.*, 2023 WL 5574854, at *6 (S.D.N.Y. Aug. 29, 2023) (similar), *amended on reconsideration in part*, 2023 WL 8434700 (S.D.N.Y. Dec. 5, 2023).  The factor also concerns shared materials and facilities.  *See Flores v. 201 W. 103 Corp.*, 256 F. Supp. 3d 433, 442 (S.D.N.Y. 2017) (use of same payroll office and common storage space shows single, integrated enterprise); *Chen v. TYT E. Corp.*, 2012 WL 5871617, at *4 (S.D.N.Y. Mar. 21, 2012) (restaurant, together with its parent company, was a single integrated enterprise where the restaurant shared basement storage space with a bakery owned and operated by the parent); *Goldman v. Sol Goldman Invs. LLC*, 2022 WL 6564021, at *7 (S.D.N.Y. Aug. 5, 2022) (SGI and Solil operated out of the same office, further supporting the conclusion that they operate as a single integrated employer), *report and recommendation adopted*, 2022 WL 4482296 (S.D.N.Y. Sept. 27, 2022).  Where two nominally separate companies share employees, materials, and facilities, that tends to suggest that they form part of a single integrated enterprise.  *See Regan v. In the Heat of the Nite, Inc.*, 1995 WL 413249, at *3 (S.D.N.Y. July 12, 1995) (finding it to be "significant" that "employees of the various taverns and restaurants alleged to constitute the common enterprise rotate informally among the different establishments"); *Castillo v. Isakov*, 2023 WL 6664552, at *3 (S.D.N.Y. Oct. 12, 2023) (holding on default judgment that entity defendants were interrelated where they shared employees).

The second factor, centralized control of labor relations, looks to whether there has been centralization of "tasks such as handling job applications, approving personnel status reports, and exercising veto power over major employment decisions." *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 341 (2d Cir. 2000); *See Salemi v. Boccador, Inc.*, 2004 WL 943869, at *3 (S.D.N.Y. Apr. 29, 2004) (centralized control found where defendant allegedly exercised complete control over hiring and firing of general manager); *Cuaya v. VI Dev. Grp., LLC*, 2020 WL 5494371, at *8 (S.D.N.Y. Sept. 10, 2020) (centralized control found where defendant allegedly exercised the power and delegated to managers and supervisors the power to hire and fire employees). Centralized control may also be shown where the same individuals own and manage the entities, implement employment policies across locations, and operate out of shared offices. *See, e.g.*, *Galicia v. Ice Cream House on Bedford Ave LLC*, 2017 WL 6733985, at *4 (E.D.N.Y. Oct. 17, 2017), *report and recommendation adopted*, 2017 WL 6759299 (E.D.N.Y. Dec. 29, 2017). Evidence that employees split time between two companies can also show that labor relations were centrally controlled. *See Regan*, 1995 WL 413249, at *3 (fact that "employees of Manny's Car Wash can be called upon to fill in at, for example, the Bear Bar or Brother Jimmy's if either of the other two restaurants are short-staffed" is not only "good evidence that the various bars maintain 'interrelated operations,' . . . but it also supports a reasonable inference of the presence of the most important factor in the analysis—the 'centralized control of labor relations.'"); *Chimbay v. Pizza Plus at Staten Island Ferry, Inc.*, 2016 WL 1064611, at *4 (S.D.N.Y. Mar. 14, 2016) ("Defendants exercise central control over labor relations by . . . shifting food service employees among the different restaurants without requiring the employees to go through new job application or training processes."); *Hunan Manor Enter.*, 2023 WL 5574854, at *7 ("Defendants' testimony established

that they demonstrated control over employees at the restaurants owned by their co-Defendants and could hire, direct, and fire employees at restaurants owned by their co-defendants.").

The third factor, common management, may be established by "facts suggesting that the same individuals manage and oversee operations" at the multiple entities. *Jaramillo v. Latino Regal Corp.*, 2023 WL 8828823, at *5 (E.D.N.Y. Dec. 21, 2023) (citing *Juarez* , 29 F. Supp. 3d at 367); *Ferrara v. Smithtown Trucking Co.*, 29 F. Supp. 3d 274, 283 (E.D.N.Y. 2014) (Bianco, J.).

Finally, with respect to common ownership or financial control, "courts have found multiple corporate defendants to constitute a single employer where they were owned, maintained, and controlled by the same owners during the relevant timeframe and those individuals applied the same pay policies, practices, and procedures to all hourly employees during the relevant period." *de Los Santos v. Marte Constr., Inc.*, 2020 WL 8549054, at *4 (S.D.N.Y. Nov. 25, 2020) (citation omitted), *report and recommendation adopted*, 2020 WL 8549055 (S.D.N.Y. Dec. 17, 2020); *see also Cuji v. Sistina Rest. Inc.*, 2021 WL 11493286, at *5 (S.D.N.Y. Aug. 2, 2021) (finding "common ownership or financial control" where plaintiff alleged that "the two corporate defendants in this case were both owned and managed by the Individual Defendants"); *Cook*, 69 F.3d at 1241 (co-defendants ASI and KDT shared a common management structure where "ASI cleared all major employment decisions with KDT" and ASI's president operated out of KDT's office).

In the restaurant industry, "facts that go to the existence of a single, integrated enterprise include common decor, name, menu and marketing; the use of the same employees at multiple locations; the transfer of items between restaurants; use of the same central payroll office, common storage space and leases; and the distribution of common employee guidelines and procedures

across different businesses." *Khereed v. W. 12th St. Rest. Grp. LLC*, 2016 WL 590233, at *4 (S.D.N.Y. Feb. 11, 2016) (citing *Juarez*, 29 F. Supp. 3d at 367–68).

The undisputed evidence establishes that The Bao and Uluh operate as a single integrated enterprise. There is no genuine issue of fact that the two restaurants shared employees; classmembers who worked at The Bao would be asked to also work at Uluh and vice versa. Numerous employees testified either that they divided their work between The Bao and Uluh or that they knew of other employees who did so. Dkt. No. 122-10 at 55:22–60:10; Dkt. No. 122-11 at 33:11–14; Dkt. No. 122-15 at 51:16–24; Dkt. No. 122-16 at 47:4–48:12; Dkt. No. 132-1 at 62:11–63:10; Dkt. No. 122-18 at 54:3–21; Dkt. No. 122-19 at 30:2–31:5. Moreover, payroll records show that more than a dozen employees were paid for work performed at both restaurants—even within the same week. Dkt. No. 122-23. Lam also participated in text conversations confirming that employees were sent between the two restaurants. Dkt. No. 122-20 at ECF p. 5; Dkt. No. 122-21 at ECF p. 3; *see also* Dkt. No. 122-22 at ECF p. 9 (text conversation showing that employee whom Defendants identify as a manager informed Mangahas "we don't want to mix ppl from the Bao and [Uluh] *any more*" (emphasis added)). Tipped employees sent between the two restaurants did not need to retrain, re-interview, or reapply for work. Dkt. No. 138 ¶ 23. It is immaterial that not every employee who worked at The Bao also worked at Uluh or vice versa. The first factor looks to whether the two companies shared employees, not to whether every employee at one company also worked at the other. *Trustees of the Loc. 813 Pension Tr. Fund v. Canal Carting, Inc.*, 2014 WL 843244, at *6 (E.D.N.Y. Mar. 4, 2014); *Rahman v. Limani 51, LLC*, 2022 WL 3927814, at *6 (S.D.N.Y. Aug. 31, 2022)

Moreover, the Bao and Uluh additionally shared services in the form of a joint office and storage space in Uluh's basement. Dkt. No. 138 ¶¶ 19, 22. Defendants dispute Plaintiffs' claim

that the restaurants share supplies, arguing that the Bao merely utilizes Uluh's basement to store its own supplies such as napkins, alcohol, and dumplings. Dkt. No. 122-4 at 58:16–59:2; Dkt. No. 122-10 at 54:11–55:23; Dkt. No. 122-11 at 32:16–33:4. But that exalts form over substance. Each restaurant necessarily would need napkins, alcohol, and dumplings—they were each Chinese restaurants serving dumplings and alcohol. The point is not that they each had their own need for the food and drink they sold their customers. It is that they shared the space to keep those products. *See Chen*, 2012 WL 5871617, at *4; *Flores*, 256 F. Supp. 3d at 442.

There also is undisputed evidence of centralized control of labor relations and common management. It is undisputed that the same person—Lu Mei Zhang—managed both restaurants and that she did so out of a shared space, the Office. Dkt. No. 138 ¶¶ 19–20. It is also undisputed that the same person—Lam—owned both restaurants. *Id.* ¶¶ 10–11, 34–35 Dkt. No. 124 at 5 (citing Dkt. No. 122-32 at 11:17–19); Dkt. No. 139 at 6 (same). There is no genuine dispute that the handling of job applications, major employment decisions, and personnel and pay policies for the two restaurants was centralized with those two individuals; Lam "is involved in the hiring and interviewing process at The Bao and Uluh," "Lam is involved in employee evaluations," "Lam, along with general manager and Lu Mei Zhang, w[as] involved in determining the rates of pay applicable to Plaintiffs and other tipped workers" and "[u]ltimately, employees, including management employees, report to Lam." *Id.* ¶¶ 34, 47–48, 50, 54. Furthermore, according to Upendra Shahi, The Bao's "primary manager," Dkt. No. 139 at 17, before he could hire or fire anyone at The Bao, he would submit his opinion to Lam and Hong Bao to obtain approval. Dkt. No. 126-11 at 22:1–18.

Defendants' pay policies, practices, and procedures were consistent across the two restaurants. It is undisputed that: (1) Defendants applied a tip credit toward to wages of tipped

workers at both The Bao and Uluh, Dkt. No. 138 ¶ 33; (2) both restaurants instituted tip pools that included team leaders, *id.* ¶ 66, (3) both restaurants assigned tipped workers side work based upon the restaurant's business needs on a given day, *id.* ¶ 75; and both Defendants had the same uniform deposit policy, *id.* ¶ 87. Defendants additionally used identical handbooks and nearly identical wage notices and wage statements for employees at the two restaurants. *Id.* ¶¶ 25–26, 61; Dkt. No. 122-24 (restaurants have identical handbooks that stated the same policies pertaining to attendance, tardiness, employee appearance, punching in and out, cell phone use, and general conduct).

Defendants fail to identify evidence that would create a genuine issue of material fact. Defendants argue that "[e]ach restaurant had a certain level of autonomy in regards to control of labor relations in that each restaurant had [its] own individual figure on a daily basis controlling [its] respective employees." Dkt. No. 139 at 16–17. Defendants also argue, and Lam testified, that it was at all times "against the two companies' policies" for employees to split their time between the restaurants. Dkt. No. 138 ¶ 24; Dkt. No. 126-7 at 98:11–99:8. Finally, Defendants submit evidence that restaurants had distinct menus, marketing materials, and interiors. Dkt. Nos. 122-5, 122-6, 140-2, 140-3, 140-18, 140-19. None of those factors, in isolation or in aggregate, creates a genuine issue of fact for trial.

There is evidence that individuals aside from Lam and Hong Bao, "such as opt-in Plaintiff Upendra Shahi and [Zhang], had the authority to hire or fire employees and their decisions did not involve the other corporate entities and vice versa." Dkt. No. 139 at 16 (citing Dkt. No. 140-5 at 21:19–22:18; Dkt. No. 140-16 at 8:9–15). A reasonable jury could not find that such evidence was inconsistent with the two companies being a single integrated enterprise or that it would overcome the evidence offered by Plaintiffs. Two companies can form a single integrated

enterprise even if each companies delegates the execution of particular employment decisions to lower-level employees.  Indeed, it is inherent in any organization of more than a few people that some policies will be made by more senior managers while the execution of policy may be left to subordinates.    The single integrated enterprise test looks to whether veto power and decision-making "over major employment decisions,"  is centralized, *Parker*, 204 F.3d at 341, not to whether decision-making over every decision that could affect employment is centralized.  *See Ghaffar v. Willoughby 99 Cent, Inc.*, 2010 WL 3420642, at *3 (E.D.N.Y. Aug. 27, 2010) (granting summary judgment as to single integrated enterprise where the owner and the general manager "approved hiring decisions").  Here, the evidence is undisputed that the authority to make every significant employment decision, whether over employees or over pay practices, was centralized with Lam and Zhang for both restaurants.  Although The Bao and Uluh were additionally managed by intermediary team leads or managers, Lam hired, fired, and supervised those managers—and exercised a significant role in overseeing tipped employees.  *See Parker*, 204 F.3d at 341; *Salemi*, 2004 WL 943869, at *3; *Cuaya*, 2020 WL 5494371, at *8.  Shahi testified that his hiring and firing decisions were subject to Lam and Hong Bao's veto.  *See* Dkt. No. 140-5 at 21:19–22:18.  As a matter of law, the fact that each restaurant had some lower level managers who carried out Lam and Zhang's policies cannot create a genuine issue of fact.

Likewise, the existence of a nominal policy against time-splitting cannot create a genuine issue of fact.  The single integrated enterprise analysis looks to economic reality and not to form.  *See Ayala v. Your Favorite Auto Repair & Diagnostic Ctr., Inc.*, 2016 WL 5092588, at *16 (E.D.N.Y. Sept. 19, 2016) ("[T]he Second Circuit has held that determining employer status for purposes of the FLSA involves a fact-specific inquiry, requiring courts to look at the totality of the circumstances 'in light of economic reality.'" (quoting *Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d

61, 71 (2d Cir. 2006)).  "[T]he decisive factor as to whether a named defendant is responsible for FLSA violations as to a particular plaintiff turns on control, whether formal *or functional*."  *Hsieh Liang Yeh v. Han Dynasty, Inc.*, 2019 WL 633355, at *8 (S.D.N.Y. Feb. 14, 2019) (emphasis added).  Two companies that are otherwise integrated cannot avoid liability for each others' labor law policies by the expedient of adopting a policy that exists only on paper and not in practice.  *See Ramirez v. Liberty One Grp. LLC,* 2023 WL 4541129, at *5 (S.D.N.Y. July 14, 2023) ("If maintaining distinct corporate forms were enough to defeat a single integrated enterprise allegation, the doctrine would be meaningless:  It is, after all, specifically applied in circumstances where entities are nominally separate but are, in effect, part of the same organizational structure such that it would be illogical to shield one from liability.").  That is the case here.  While Lam testified to the existence of a policy, Dkt. No. 140-1 at 107:21–108.21, there is no evidence that the policy was followed.  The only documentary evidence substantiating Lam's testimony is a text conversation between Yunrui Du (team leader and manager at Uluh) to Mangahas (who was originally hired at The Bao) that postdates the filing of the lawsuit stating that "we don't want to mix ppl from the Bao and [Uluh] any more but I [will] still keep you one day working here to make it fair."  Dkt. No. 122-22; Dkt. No. 138 ¶¶ 27, 65.  It is undisputed that the time-splitting did in fact occur frequently, Dkt. No. 138 ¶ 24; Dkt. No. 122-23, and at least occasionally at Lam's direction  Dkt. No. 122-20 at ECF p. 5; Dkt. No. 122-21 at ECF p. 3.

Finally, the fact that the two technically-separate entities offered their customers slightly different products does not create a genuine issue of material fact.  Both The Bao and Uluh offer Chinese-influenced cuisine to its customers.  Dkt. No. 138 ¶ 9.  Though the menus are not identical, it is undisputed that they both prominently feature dim sum items, have relatively similar price points, and offer Peking duck as the most expensive item.  *Compare* Dkt. No. 122-5 *with*

Dkt. No. 122-6; *see Cuaya*, 2020 WL 5494371, at *7 (finding single integrated enterprise sufficiently alleged for class certification purposes because, in part, the restaurants "sell the same or similar menu items"); *Juarez*, 29 F. Supp. 3d at 368 (similar). The restaurants' similarity would not, on its own, be dispositive. *See Huer Huang v. Shanghai City Corp.*, 459 F. Supp. 3d 580, 587 (S.D.N.Y. 2020) (collecting cases). The importance of the restaurants' parallels lies with what those parallels signify about interconnected control and operations. Here, the restaurants' similarities help explain why employees could be assigned work across both restaurants such that employees sent from one restaurant to the other did not even need to retrain, Dkt. No. 138 ¶ 23, how the employment, pay, and conduct policies instituted for staff at one restaurant could be applied identically to staff at the other, *id.* ¶¶ 25–26, 33, 61, 66, 75, 87, and how Lam and Zhang could centrally manage the two restaurants either out of the shared office or by walking the two blocks to the other location, *id.* ¶ 8, 19. Though the restaurants may provide somewhat different dining experiences to customers, that does not diminish the conclusion that the employees' experiences were highly uniform.

The Court views the evidence in the light most favorable to Defendants, as the non-movants. *See The Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 960, 965 (2d Cir. 1996). Even in that light, there is no genuine dispute of material fact. The undisputed evidence is that while The Bao and Uluh may have been housed in separate corporate entities, they operated as a single integrated enterprise. They offered their customers similar fare, shared employees and resources, were owned by the same person, and were managed by the same individuals who centralized significant employment decisions and pay practices with themselves. The fact that at each restaurant there were managers who exercised some supervisory authority over employees below them cannot alone materially distinguish the integrated enterprise formed by the two

restaurants from any corporation or company where policy and significant employment decisions are set from on high but executed below. *See Keawsri*, 2021 WL 3540671, at *10 (granting summary judgment on question of whether restaurants operated as a single integrated enterprise where all four factors weighed in favor); *Chen*, 2012 WL 5871617, at *4 (same).

## III.    Individual Liability

Plaintiffs ask the Court to grant them summary judgment on the question of whether Lam and Hong Bao are employers under the FLSA and NYLL.  Dkt. No. 124 at 22–25.  Defendants conversely ask the Court to grant them summary judgment on the question of whether Hong Bao is an employer under the FLSA and NYLL.  Dkt. No. 130 at 6–12.

"Under the FLSA, an employer is defined as 'any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ." *Maldonado Juarez v. Butterfield Catering Inc.*, 2020 WL 6945944, at *3 (S.D.N.Y. Nov. 25, 2020) (quoting 29 U.S.C. § 203(d)).  "Evidence that an individual is an owner or officer of a company, or otherwise makes corporate decisions that have nothing to do with an employee's function, is insufficient to demonstrate 'employer' status." *Irizarry v. Catsimatidis*, 722 F.3d 99, 109 (2d Cir. 2013).  Instead, the individual must have "some degree of individual involvement in [the] company in a manner that affects employment-related factors such as workplace conditions and operations, personnel, or compensation." *Id.*  The United States Supreme Court has "instructed that the determination of whether an employer-employee relationship exists for purposes of the FLSA should be grounded in 'economic reality rather than technical concepts.'" *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 141 (2d Cir. 2008) (quoting *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961)).

"Among the factors to be considered are "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained

employment records." *Irizarry*, 722 F.3d at 104–05. "Establishing that these factors are met is 'sufficient but not necessary' to allege that an individual is an employer." *Maldonado Juarez*, 2020 WL 6945944, at *3 (quoting *Zheng*, 355 F.3d at 72). Instead, district courts are "free to consider any other factors it deems relevant to its assessment of the economic realities." *Perez v. Westchester Foreign Autos, Inc.*, 2013 WL 749497, at *7 (S.D.N.Y. Feb. 28, 2013). "Courts applying both the FLSA and the New York Labor Law have concluded that the standards by which a court determines whether an entity is an 'employer' under the FLSA also govern that determination under the [NYLL]." *Hart v. Rick's Cabaret Int'l Inc.*, 2010 WL 5297221, at *2 (S.D.N.Y. Dec. 20, 2010); *see Ansoumana v. Gristede's Operating Corp.*, 255 F. Supp. 2d 184, 189 (S.D.N.Y. 2003) (collecting cases).

### A.    Lam

Defendants do not dispute that Lam is an employer under the FLSA and NYLL. Dkt. No. 139 at 19. Summary judgment is therefore granted to Plaintiffs on this matter.

### B.    Hong Bao

Hong Bao testified that she thinks of herself as a "lady boss." Dkt. No. 138 ¶ 37; Dkt. No. 122-33 at 20:18–21. She is paid approximately $140,000–160,000 per year, drawing income from both The Bao and Uluh. Dkt. No. 135 at 17:6–19. She holds a "quality control" roll at the two restaurants. Dkt. No. 138 ¶ 37; Dkt. No. 135 at 17:20–23. In her "quality control" role, Hong Bao "mak[es] sure the dishes are done right" with regard to plating and consistent quality. Dkt. No. 135-18 at 18:3–7. In that capacity, she interacts more with the kitchen staff than with servers. *Id.* at 18:20–19:7, 19: 21–20:3; *see also* Dkt. No. 122-14 at 36:10–15 (Hong Bao and Lam would "tell the dessert person how to make the dessert"); Dkt. No. 135-13 at ECF p. 6 (expressing concerns regarding food presentation); Dkt. No. 135-13 at ECF p. 4 (expressing concerns regarding a typo on the menu).

It is undisputed that Hong Bao does not maintain any of the employment records for either Eight Oranges or Chibaola. Dkt. No. 136 ¶¶ 16–17. Plaintiffs do not point to any evidence that Hong Bao controls employees' rate or method of payment and do not dispute that Lam, Zhang, other team leaders, and the accountant were responsible for determining the rate and method of payment. *Id.* ¶ 15.

Plaintiffs provide some evidence that Hong Bao controlled employee work schedules or the terms of employment.[4] On a WeChat group for Uluh, Hong Bao texted an employee "You have to go to work" and offered that the company would reimburse a taxi. Dkt. No. 135-13 at ECF p. 2.[5] Plaintiffs Yi Zhang and Yongfeng Situ also testified that they interviewed with Lam and Hong Bao. Dkt. No. 122-19 at 14:6–8; Dkt. No. 122-18 at 21:19–22:1, 24:8–22. When asked if Shahi had to run his hiring and firing decisions through anybody else, Shahi testified that he would share the opinion with Hong Bao and Lam and "they [would] give me the authority." Dkt. No. 140-5 at 21:19–22:10; *see also* Dkt. No. 135-10 at 41:23–25 (Plaintiff Keno Dacusin testified that Hong Bao and Lam had the authority to hire and fire employees).

On the other hand, Hong Bao and Lam submitted declarations stating that she does not participate in or oversee the hiring and firing of employees at either Eight Oranges or Chibaola. Dkt. No. 127 ¶ 12; Dkt. No. 128 ¶ 11. In support, Defendants point to several employees that were hired apparently without Hong Bao's input. *E.g.* Dkt. No. 126-11 at 7:14–15; Dkt. No. 126-9 at

---

[4] Plaintiffs additionally point to evidence that in the restaurant WeChat group, Hong Bao would give instructions of what to do and what to display. Dkt. No. 122-16 at 21:7–15. She instructed employees on how to make tea or sell new food items to the customers. Dkt. No. 122-14 at 36:10–15. She pointed out cleanliness issues on the floor. Dkt. No. 122-11 at 48:23–49:12. "However, Plaintiffs cite no authority for the proposition that assignment of daily tasks, when unrelated to hours worked or wages received, is relevant to the 'employer' analysis." *Allende v. PS Brother Gourmet, Inc.*, 2013 WL 11327098, at *3 (S.D.N.Y. Feb. 1, 2013) (Nathan, J.).

[5] Hong Bao's messages were originally in Chinese but were translated by the WeChat application.

10:13–16; Dkt. No. 126-16 at 14:24–15:7.  And there is no dispute that Hon Bao was not involved in setting employees' schedules.  Dkt. No. 127 ¶ 13; Dkt. No. 128 ¶ 12; Dkt. No. 137 at 6.  Lam testified that team leaders make the work schedules, Dkt. No. 126-7 at 47:3–5, and at least two employees also testified that Zhang had arranged their working schedules.  Dkt. No. 126-14 at 30:14–7; Dkt. No. 126-12 at 8:19–9:4.

Plaintiffs argue that even at summary judgment, the Court need not credit Hong Bao's declaration because she testified that she signs documents given to her by her husband without first reading them.  Dkt. No. 137 at 11 (citing Dkt. No. 135-2 at 25:11–22, 27:12–28:22).  In addition, despite the fact that Hong Bao does not speak English fluently, she testified that, at least as of the date of her deposition, no documents related to the lawsuit had been translated for her.  Dkt. No. 135-2 at 20:12–14; Dkt. No. 136 ¶ 17; Dkt. No. 138 ¶ 41.  Plaintiffs claim that Hong Bao's declared statement that she is not involved in hiring contradicts her prior deposition testimony stating that she did not remember hiring, firing, or interviewing candidates.  Dkt. No. 137 at 14–15.[6]

"Ordinarily, when a district court is asked to consider contradictory deposition testimony of a fact witness at summary judgment, 'a district court may not discredit a witness's deposition testimony . . . because the assessment of a witness's credibility is a function reserved for the jury.'"  *Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 206 (2d Cir. 2014) (quoting *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010)).  The "sham issue of fact" doctrine is an exception to that rule and "prohibits a party from defeating"—or in this case, Plaintiffs argue, obtaining—"summary judgment simply by submitting an affidavit that contradicts the party's

---

[6] Although Plaintiffs cite Dkt. No. 135-2 at 26:4–25, page 26 is omitted from the filing and the Court cannot confirm the actual contents of that deposition testimony.

previous sworn testimony." *In re Fosamax Prod. Liab. Litig.*, 707 F.3d 189, 193 (2d Cir. 2013) (per curiam); *see also Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) ("[F]actual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts her own prior deposition testimony."). Here, however, Plaintiffs have not demonstrated that Hong Bao's declaration "inescapably and unequivocally" contradicted her earlier testimony without explanation. *Moll*, 760 F.3d at 206. Hong Bao not remembering interviewing, hiring, or firing employees is wholly consistent with not having interviewed, hired, or fired employees. *See Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38, 43 (2d Cir. 2000) (the principle does not apply if the deposition and the later sworn statement are not actually contradictory); *Langman Fabrics v. Graff Californiawear, Inc.*, 160 F.3d 106, 112 (2d Cir. 1998) ("If there is a plausible explanation for discrepancies in a party's testimony, the court considering a summary judgment motion should not disregard the later testimony because of an earlier account that was ambiguous, confusing, or simply incomplete."). And the fact that Hong Bao may have previously signed legal documents without comprehending them does not necessitate a finding at the summary judgment stage that the same was done with regard to her declaration.

Ultimately, Plaintiffs' and Defendants' warring accounts of Hong Bao's role and authority demonstrate that there is a genuine issue of material fact. *See Mendez v. Pizza on Stone, LLC*, 2012 WL 3133522, at *2 (S.D.N.Y. Aug. 1, 2012) (denying summary judgment where there was a disputed issue of material fact as to whether the individuals had the power to hire and fire employees or exercise control over work schedules and employment conditions); *McGlone v. Cont. Callers, Inc.*, 49 F. Supp. 3d 364, 374 (S.D.N.Y. 2014) (denying summary judgment where the defendant did not set the rate of pay or control employees' schedules or conditions of

employment but did interview and hire the employees' supervisor). Summary judgment on this issue is therefore denied.

## IV.    Tip Credit

Under both the FLSA and the NYLL, an employer may pay an employee who receives tips a rate below the minimum wage, so long as the wage paid plus the employee's tips equals or exceeds the minimum wage. *See Galvez v. 800 Ginza Sushi Inc.*, 2022 WL 748286, at *9 (S.D.N.Y. Mar. 11, 2022); 29 U.S.C. § 203(m)(2)(A); N.Y.C.R.R.. § 146-1.3. FLSA and the NYLL thus permit employers to take a "tip credit" whereby a portion of employees' tips are used to offset the minimum wage and permit employers to pay less.[7]

However, both statutes provide that an employer is not entitled to apply a tip credit unless the employer meets certain conditions, including sufficient notice to the employee. *Galvez*, 2022

---

[7] The tip credit is not without its historical controversy. During the early years of the FLSA, many employers included tips received by employees to satisfy the employer's minimum wage obligations. The United Supreme Court first addressed that practice in *Williams v. Jacksonville Terminal Co.*, 315 U.S. 386 (1942). The *Williams* Court held that the practice was permitted because FLSA "is not intended to do away with tipping[;] [n]or does it appear that Congress intended by the general minimum wage to give the tipping employments an earnings-preference over the non-service vocations." *Id.* at 388. The *Williams* Court additionally noted that "[t]he diverse interests of employers and employees have variously influenced legislators to include, exclude, or ignore tips in the specification of wage items in enactments where the wage base was important." *Id.* at 404 (citing statutes). Justice Black, dissenting, observed: "One who gives a red cap a tip does not necessarily know that he is thereby helping the railroad to discharge its statutory duty of paying a minimum wage to its employees." *Id.* at 410–11. He queried "Upon whom does the statute impose the duty of paying a minimum wage, the employer or someone else?" and noted that "[a] plan like that before us, which covertly diverts tips from employees for whom the giver intended them to employers for whom the giver did not intend them and to whom any kind of tip doubtless would not have been voluntarily given, seems to me to contain an element of deception." *Id.* In 1967, Congress acknowledged the so-called resulting tip credit by permitting employers to count weekly tips as satisfying up to fifty percent of the minimum wage. 29 C.F.R. § 531.59 (1967). In 1996, Congress amended the FLSA to remove the percentage-based system and instead mandate that tips be used to satisfy the minimum wage only up to the delta between the tipped minimum wage and the untipped minimum wage. Small Business Job Protection Act of 1996, Pub. L. No. 104–188 § 203, 110 Stat 1755 (1996). As of the date of publication, that delta is $5.12. *See Minimum Wages for Tipped Employees*, U.S. Dep't of Lab. (Jul. 1, 2024) https://www.dol.gov/agencies/whd/state/minimum-wage/tipped.

WL 748286, at *9.  Tip credits are also unavailable under the FLSA if employers improperly distribute pooled tips to individuals ineligible for tip pooling, *see Shahriar*, 659 F.3d at 240, and unavailable under the NYLL for any day on which the employee spends more than two hours or twenty percent of their time performing untipped work, *see Adonias v. Al Horno Lean Mexican Kitchen Inc.*, 2018 WL 4007643, at *8 (S.D.N.Y. Aug. 22, 2018).  If an employer fails to provide the required notice or distributes any amount of pooled tips to an individual ineligible for tip pooling, then the employer is disqualified from counting any tips as a tip credit and must pay the employee the minimum wage, without taking into account any tips that the employee may receive or have received.  *See Shahriar*, 659 F.3d at 240; *Galvez*, 2022 WL 748286, at *9.  Additionally, under the NYLL, if an employee spends more than two hours or twenty percent of their shift engaged in untipped work, the employer is disqualified from counting any tips as a tip credit and must pay the employee the minimum wage for that entire day.  *See Salinas v. Starjem Rest. Corp.*, 123 F. Supp. 3d 442, 470 (S.D.N.Y. 2015).

## A.    Notice

"Under the FLSA, an employer may not claim a tip credit as to an employee's wages unless the employer has informed that employee of the provisions of the section of the FLSA permitting the tip credit."  *Inclan v. N.Y. Hosp. Grp., Inc.*, 95 F. Supp. 3d 490, 497 (S.D.N.Y. 2015); *see* 29 U.S.C. § 203(m)(2)(A) ("The [tip credit provision] shall not apply with respect to any tipped employee unless such employee has been informed by the employer of the provisions of this subsection.").  "The notice provision is 'strictly construed' and 'requires that an employer take affirmative steps to inform affected employees of the employer's intent to claim the tip credit.'"  *Galvez*, 2022 WL 748286, at *9 (quoting *Inclan*, 95 F. Supp. 3d at 497).  Specifically, employers must provide employees with information as to:

> (i) the amount of cash wage the employer is paying a tipped employee;
> (ii) the additional amount claimed by the employer as a tip credit;
> (iii) a statement that the tip credit claimed by the employer cannot exceed the amount of tips actually received by the tipped employee;
> (iv) a statement that all tips received by the tipped employee are to be retained by the employee except for a valid tip pooling arrangement; and
> (v) a statement that the tip credit will not apply to any tipped employee unless the employee has been informed of these tip credit provisions.

*Keawsri*, 2021 WL 3540671, at *14 (quoting *Chichinadze v. BG Bar Inc.*, 2021 WL 429948, at *9 (S.D.N.Y. Feb. 8, 2021)); *see* Wage and Hour Division, U.S. Dep't of Labor, Fact Sheet #15: Tipped Employees Under the Fair Labor Standards Act (FLSA) (Apr. 2018). "However, the FLSA's notice provision does not require that the notice be given in writing." *Gamero v. Koodo Sushi Corp.*, 272 F. Supp. 3d 481, 501 (S.D.N.Y. 2017) (citation omitted), *aff'd*, 752 F. App'x 33 (2d Cir. 2018). The employer bears the burden of showing that it satisfied the notice requirement. *See id.* "Because the employer has the ultimate burden to prove compliance with the tip credit notice requirement, an employer opposing summary judgment on this issue must 'do more than point to a dearth of evidence'" and must instead "'adduce definite competent evidence showing that [employees] were informed of the tip credit.'" *Inclan*, 95 F. Supp. 3d at 498 (quoting *Perez v. Lorraine Enterprises, Inc.*, 769 F.3d 23, 30 (1st Cir. 2014)).

The NYLL similarly requires notice before an employer may claim any tip credit. *See* N.Y.C.R.R. § 146-1.3 ("An employer may take a credit towards the basic minimum hourly rate if a service employee or food service worker receives enough tips and if the employee has been notified of the tip credit as required in section 146-2.2 of this Part."). "[T]here is a critical distinction between the NYLL's notice provision and the FLSA's: Notice of the tip credit under the NYLL must be written." *Gamero*, 272 F. Supp. 3d at 501 (citation omitted). The NYLL states that prior to the start of employment and upon any change in the employee's hourly rates of pay, the employer "shall give each employee written notice of the employee's regular hourly pay rate,

overtime hourly pay rate, the amount of tip credit, if any, to be taken from the basic minimum hourly rate, and the regular payday." N.Y.C.R.R. § 146-2.2(a)–(b). The notice shall also state that extra pay is required if tips are insufficient to bring the employee up to the basic minimum hourly rate. *Id.* The notice is to be provided in English and the employee's primary language (so long as it is one of the languages in which the form notice is available on the New York Department of Labor's website). *Id.*[8] Finally, the employer must keep an acknowledgment of receipt signed by the employee for six years. N.Y.C.R.R. § 146-2.2(c). As with the FLSA, "[i]t is defendants' burden to demonstrate that the prerequisites for a tip credit have been met." *Marin v. Apple-Metro, Inc.*, 2017 WL 4950009, at *24 (E.D.N.Y. Oct. 4, 2017), *report and recommendation adopted as modified on other grounds*, 2020 WL 6157011 (E.D.N.Y. Oct. 21, 2020); N.Y.C.R.R. § 146-2.2(d).

If an employer fails to provide the required notice under either FLSA or the NYLL, it is liable in the amount of the employee's unpaid minimum wage as if there had been not tip credit allowance. *See Inclan*, 95 F. Supp. 3d at 497–98 ("If the employer cannot show that it has informed employees that tips are being credited against their wages, then no tip credit can be taken and the employer is liable for the full minimum-wage." (citing *Reich v. Chez Robert, Inc.*, 28 F.3d 401, 403 (3d Cir. 1994))); *Gomez v. MLB Enters., Corp.*, 2018 WL 3019102, at *6 (S.D.N.Y. June 5, 2018); *Orellana v. One If By Land Rest. LLC*, 2020 WL 5768433, at *11 (S.D.N.Y. Sept. 27, 2020). Courts have stated that "if the penalty for omitting notice appears harsh, it is also true that notice is not difficult for the employer to provide." *Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F.

---

[8] *See* Notice of Pay Rate, N.Y. Dep't of Lab., https://dol.ny.gov/notice-pay-rate. Employers may also provide their own notice.

Supp. 2d 253, 288 (S.D.N.Y. 2011) (quoting *Martin v. Tango's Rest., Inc.*, 969 F.2d 1319, 1323 (1st Cir. 1992)).

It is undisputed that Defendants applied a "tip credit" towards the wages of Plaintiffs and other front of house Tipped Workers at both The Bao and Uluh.  Dkt. No. 138 ¶ 33.  The parties do, however, dispute whether Defendants provided adequate notice of their intent to claim the tip credit.  Defendants argue that they provided notice of the tip credit through a combination of several different means:  (1) Defendants verbally informed front-of-house employees that their pay would be $10 per hour plus tips; (2) Defendants posted labor law posters in the restaurant; and (3) Defendants "tried their best to implement a policy in which employees would have to sign a form created by the New York State Department of Labor acknowledging the employee's pay rate." Dkt. No. 139 at 8.

There is no genuine issue of fact that Defendants violated the NYLL's express written notice requirement and, accordingly, Plaintiffs are entitled to summary judgment on this issue.  Oral notice itself does not satisfy the NYLL's express written notice requirement.  *See* N.Y.C.R.R. § 146-2.2(a)–(b); *Gamero*, 272 F. Supp. 3d at 501. Nor, as a matter of law, do the labor law posters Defendants posted in the restaurants satisfy the NYLL requirements.  Dkt. No. 140-11.  The submitted pictures of the hanging posers are small and blurry so as to preclude any actual scrutiny. *Id.*  "[T]here is no evidence as to what the poster actually said and whether it actually informed the employees in accordance with the requirements of the FLSA."  *Velez*, 2016 WL 9307471, at *8; *see Hwangbo v. Kimganae, Inc.*, 2023 WL 2710669, at *9 (E.D.N.Y. Mar. 30, 2023) ("The unclear nature of this photo does not satisfy any aspect of FLSA's notice requirements since the Court cannot assess its contents.").  Even if the Court could examine the posters, as Defendants acknowledge, "[i]n recent years, the Southern District have determined that generic law posters

alone are insufficient to meet [the notice requirements] of the tip credit." Dkt. No. 139 at 25 (citing *Chichinadze*, 517 F. Supp. 3d at 256; *Hernandez*, 2016 WL 3248493, at *22); *see also Copantitla*, 788 F. Supp. 2d at 289 ("A generic government poster could inform employees that minimum wage obligations exist, but could not possibly inform employees that their employers intend to take the tip credit with respect to their salary."). Defendants neither argue, nor submit evidence showing, that the posters informed Plaintiffs that their tips would credited against their wages to make up the minimum wage.

Finally, while Defendants argue that they "tried their best" to have employees sign a New York State Department of Labor form acknowledging the employee's pay rate, Dkt. No. 139 at 8, that is insufficient to forestall summary judgment  The only document cited in support is Dkt. No. 122–39, the wage notices. The wage notices are plainly insufficient to provide notice. Of the eight wage notices Defendants produced in the action, five do not check the tip credit allowance box and the remaining three check the tip credit box but do not state the amount of any tip credit to be taken. *Id.* Absent disclosure of the amount the employer intended to claim as a tip credit, the wage notices cannot serve as proper notice under the NYLL. *See* N.Y.C.R.R. § 146-2.2 ("[A]n employer shall give each employee written notice of . . . the amount of tip credit."); *Hernandez*, 2016 WL 3248493, at *25 ("Defendants do not contend that they ever provided the delivery workers with a written notice of their regular hourly pay rate, overtime hourly pay rate, and the amount of tip credit, if any, to be taken from the basic minimum hourly rate as required by § 146-2.2." (citation omitted)).

Defendants "admit that any one of these forms of notice alone do not meet the notice requirements of the FLSA and NYLL" but argue that "when combined," the verbal notice, labor law posters, and wage statements "should be sufficient to serve as notice to any employee of the

Restaurants of their pay rate and any tip credit taken." Dkt. No. 139 at 26. The Court rejects this argument. The documents together or alone fail to provide the requisite written notice. No form of notice *ever* indicated to Plaintiffs what amount of their tips Defendants intended to take as a credit toward the minimum wage and viewing the insufficient notices in the aggregate does not solve that issue. *See* N.Y.C.R.R. § 146-2.2; *Hernandez*, 2016 WL 3248493, at *25 (notice under the NYLL must include "the amount of tip credit, if any, to be taken from the basic minimum hourly rate"). For this reason, the several forms of notice fail to comply with the FLSA's notice dictates. *See Chichinadze*, 517 F. Supp. 3d at 254 (notice under the FLSA must include "the additional amount claimed by the employer as a tip credit"); *Keawsri* 2021 WL 3540671, at *14 (same). Because it is Defendants' burden to provide admissible evidence showing that employees were properly informed of the tip credit, *Inclan*, 95 F. Supp. 3d at 498, and Defendants have not produced any evidence to that effect, Plaintiffs are entitled to summary judgment on their NYLL tip credit claims.

Plaintiffs are further entitled to summary judgment on the claim that Defendants violated the FLSA notice requirements because Defendants provide no evidence Plaintiffs received notice that their tips would be credited against the minimum wage. The testimony of the witnesses regarding the oral notices they received is not uniform but none testified they received notice that would satisfy the FLSA notice requirements. Numerous Plaintiffs testified that they were never advised that their tips would be used to satisfy The Bao or Uluh's minimum wage obligations at all. *E.g.* Dkt. No. 122-25 at 41:16–42:6; Dkt. No. 122-26 at 14:18–15:11; Dkt. No. 122-14 at 12:16–13:2, Dkt. No. 122-10 at 13:17–23, 29:18–22, 36:2–12; Dkt. No. 122-28 at 26:8–11; Dkt. No. 122-13 at 15:14–1623, 20:2–8; Dkt. No. 132-1 at 12:15–13:11, 35:2–36:6; Dkt. No. 122-19 at 13:12–14:25; Dkt. No. 122-18 at 34:13–35:11; Dkt. No. 122-27 at 32:18–34:2. A few were

told they would be receiving a wage of $10 an hour "plus tips." *E.g.* Dkt. No. 122-29 at 36:18–37:6; Dkt. No. 122-15 at 17:5–20; Dkt. No. 122-11 at 59:1–6; Dkt. No. 122-16 at 9:21–10:10; Dkt. No. 140-4 at 40:21–42:6.  Informing an employee that they would be paid $10 plus tips does not inform the employee that the employer intends to take a tip credit as an allowance that will be offset against the employee's wages. *See Lopez*, 2021 WL 1164336, at *9 (informing employee that they could keep tips does not constitute notice of intent to take a tip credit); *Hernandez*, 2016 WL 3248493, at *24 (granting summary judgment because employees were "informed that they would be paid a fixed weekly wage and tips, but [the employer] never informed the employees that it intended to use the tips the workers received to satisfy any part of its minimum wage obligations"); *Junmin Shen v. No. One Fresco Tortillas, Inc.*, 2018 WL 6712771, at *11 (S.D.N.Y. Nov. 26, 2018) (notice was not proper under the FLSA or NYLL where employer did not communicate to plaintiffs that "any tips they received would be credited against their wages in order to achieve the minimum wage").  No witness testified that they received or gave oral notice that would satisfy FLSA's requirements.  Lam testified that team leaders "are supposed to" and "should" let new employees know how they would be paid, but he did not claim that team leaders ever did, in fact, inform new employees of the amount of the tip credit or that tips would be used to satisfy a portion of the minimum wage.  Dkt. No. 122-4 at 123:2–124:5.  He further testified that "[t]here's no written document stating that the team leader should do that" or other form of interview guideline or checklist given to team leaders conducting interviews.  *Id.* at 123:2–124:5, 119:13–17; Dkt. No. 138 ¶ 59.  Accordingly, Plaintiffs are entitled to summary judgment.  *See Velez v. 111 Atlas Rest. Corp.*, 2016 WL 9307471, at *9 (E.D.N.Y. Aug. 11, 2016) (employer's inability to identify "what information was provided orally, whether due to lack of understanding or lack of knowledge, is insufficient to establish that proper oral notice was given").

###### B.    Excessive Side Work

Plaintiffs argue the tip credit was additionally unavailable because Plaintiffs generally performed more than two hours of side work a day. Dkt. No. 124 at 32–34. New York labor law is designed to ensure that employees who are paid through tips have the opportunity to earn tips. Under New York law, an employer may not claim the tip credit (and must instead pay the full minimum wage) on any day that the relevant employee engages in non-tipped side work for more than two hours or for more than 20 percent of their shift, whichever is less. 12 N.Y.C.R.R. § 146-2.9; *see Salinas*, 123 F. Supp. 3d at 470. "Side work" includes such non-tipped, non-customer facing work such as stocking food and other materials, cleaning, and preparing food or drinks. *See Adonias*, 2018 WL 4007643, at *2.

Defendants do not dispute that opening workers generally arrived approximately thirty to forty-five minutes before the restaurants opened, though side work could take up to one hour. Dk. No. 138 ¶ 78. Such opening side work generally consisted of wiping down the floors, putting chopsticks, napkins, glasses, and plates on tables, cleaning the restrooms, setting up chairs and tables, fixing and cleaning the flowers on each table, shoveling snow, spraying the outside area with water and bleach, cleaning the occasional vandalism, filling up the water bottles and pitchers, and making tea. *Id.* ¶ 79. Throughout the day, workers were also tasked with scraping the kitchen floor, cleaning windows, throwing out the garbage, loading and unloading the dishwasher, making drinks, preparing food, cleaning the bar area, and moving and cleaning furniture. *Id.* ¶ 83. Tipped workers also performed closing side work such as restocking, sweeping and mopping the floor, decorating the restaurant for holidays, cleaning furniture, restrooms, and dishes, making tea, and refilling the soups. *Id.* ¶ 84. In all, deposed Plaintiffs who were asked about the time spent performing side work uniformly testified that they spent approximately two or more hours per shift performing side work such as cleaning, preparing food, setting up the outdoor dining space. *Id.*

¶ 76; *e.g.*, Dkt. No. 122-25 at 83:10–8; Dkt. No. 122-27 at 112:13–22; Dkt. No. 122-11 at 44:25–45:5; Dkt. No. 122–10 at 51:9–52:21; Dkt. No. 122-16 at 45:17–47:2; Dkt. No. 122-13 at 26:18–27:6; Dkt. No. 122-19 at 8:2–6, 33:11–25; Dkt. No. 122-14 at 33:19–35:5.  No witness testified to ever working less than two hours performing side work.

Defendants fail to present evidence to create a genuine issue of fact.  Defendants do not provide any documents or testimony refuting the deposed Plaintiffs' timing estimates.  It is undisputed that Defendants do not and did not keep track of the time Plaintiffs spent performing side work.  Dk. No. 138 ¶ 72.  Defendants did not perform any studies to determine the amount of side work performed by tipped workers and Defendants failed to produce a witness for a 30(b)(6) deposition that could attest to the specifics of the side work performed at the restaurants.  *Id.* ¶¶ 73–74.

Defendants argue instead that the testimony of the employees could not be accurate because the two restaurants could not have enjoyed the high sales volumes they did if employees were engaging in excessive side work because "in order to generate the sales that the Restaurants did, the front-of-house employees would constantly need to service customers."  Dkt. No. 139 at 28.  Defendants argue that "[t]he genuine issue of material fact here is that if Plaintiffs allege that all front-of-house employees spent more than 20 percent of their time performing non-tipped side work, then they would not have had any time to actually perform tip producing work."  *Id.* at 27–28.[9]  In support, Defendants point to the 2021 federal tax returns for Chibaola and Eight Oranges which state gross sales of $5,521,913.00 for Uluh and gross sales of $2,589,362.00 for The Bao.  Dkt. No. 140-14; Dkt. No. 140-15.  Because the most expensive dish at both restaurants is the

---

[9] Defendants' math is not correct.  If Plaintiffs spent more than twenty percent of their time performing side work, the amount of time left to perform tipping work would not necessarily be zero but rather some amount less than eighty percent.

Peking duck, which costs approximately $80, Defendants posit that servers must have been constantly servicing customers to reach those sales volumes.

This evidence does not create a genuine issue of fact for several reasons. First, Plaintiffs do not claim that they spent more than 20 percent of their time performing side work—they testified they spent more than two hours performing side work. As some Plaintiffs testified that shifts at both restaurants lasted about ten hours, this works out to a lower percentage of the shift that is still violative of the NYLL. *See* 12 N.Y.C.R.R. § 146-2.9; *e.g.*, Dkt. No. 122-25 at 83:10–8; Dkt. No. 122-19 at 8:7–24. Second, the argument rests on the premise that all of Defendants' reported sales volumes came from sales made to diners who were served at the restaurants themselves. But, to the extent that Defendants' argument rests on that claim, it is based on surmise and cannot defeat summary judgment. *See Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). The argument does not take into account takeout and delivery sales that would require far less of Plaintiffs' time. Dkt. Nos. 122-5, 122-6. Defendants also acknowledge that tipped employees spent a nonzero amount of the workday performing opening side work, closing side work, and additional side work throughout the day such that they were not "constantly" servicing employees. Dkt. No. 138 ¶ 71, 77–79, 82–84. Defendants do not provide evidence of the time it takes to serve a table or how many tipped workers were on duty, or otherwise demonstrate that those sales volumes would be "impossible" at Plaintiffs' rate of work.

Defendants therefore have not raised a genuine dispute of material fact as to the amount of time Plaintiffs spent performing side work and the excessive side work provides an additional basis to hold that Defendants were not entitled to application of the tip credit. [10]

---

[10] Section 203(m) of the FLSA additionally provides that "an employer may not avail itself of the tip credit if it requires tipped employees to share their tips with employees who do not 'customarily and regularly receive tips.'" *Shahriar*, 659 F.3d at 240 (quoting 29 U.S.C. § 203(m)). Because

### C.    Damages

Employers who violate Section 203(m)(2)(B) of the FLSA "shall be liable to the employee . . . in the amount of the sum of any tip credit taken by the employer" in addition to liquidated damages.  29 U.S.C. § 216(b); *see Amaya*, 2024 WL 2136044, at *3.  The NYLL similarly makes employers that improperly claim tip credits liable in the amount of employees' unpaid minimum wages without a tip credit allowance.  *See Inclan*, 95 F. Supp. 3d at 498.

Plaintiffs argue that on this summary judgment motion, in addition to finding liability, the Court may also award differential damages based on Defendants' improper use of the tip credit. Dkt. No. 124 at 31.  However, Plaintiffs' calculated damages do not account for the four workers who opted out of the class, and therefore Plaintiffs overstate the amount of damages recoverable by the class.  *See Murphy v. LaJaunie*, 2019 WL 12536881, at *2 & n.1 (S.D.N.Y. July 23, 2019) (Sullivan, J.) (recalculating damages for improper tip pooling and reducing damages to exclude employees who opted out of the class), *vacated and remanded on other grounds sub nom. Ayinola v. Lajaunie*, 855 F. App'x 30 (2d Cir. 2021); *see also Hickory Sec. Ltd. v. Republic of Arg.*, 493 F. App'x 156, 160 (2d Cir. 2012) (remanding for district court to conduct an evidentiary hearing to consider evidence with respect to the volume of bonds not "held by opt-out parties or litigants in other proceedings" for the purpose of determining aggregate damages).

Summary judgment is therefore denied as to Plaintiffs' calculated damages.

### V.    Tip Pools

Plaintiffs claim that Defendants are liable under both the FLSA and NYLL for unlawful retention of tips pursuant to the restaurant's implementation of an unlawful tip pool.

---

Defendants engaged in unlawful tip pooling by permitting managers to participate in the restaurants' tip pools, *see infra*, the tip credit was additionally unavailable on that ground.

The FLSA provides that "[a]n employer may not keep tips received by its employees for any purposes, including allowing managers or supervisors to keep any portion of employees' tips, regardless of whether or not the employer takes a tip credit." 29 U.S.C. § 203(m)(2)(B). "Thus, Congress has specifically prohibited employers covered by the FLSA from diverting employee tips to managers regardless of whether they take the tip credit." *Amaya v. La Grande Boucherie LLC*, 2024 WL 2136044, at *3 (S.D.N.Y. May 13, 2024) (citation omitted).

"New York law similarly prohibits employers from requiring tipped employees to share tips with non-service employees or managers." *Shahriar*, 659 F.3d at 240. Section 196-d of the NYLL states:

> No employer or his agent or an officer or agent of any corporation, or any other person shall demand or accept, directly or indirectly, any part of the gratuities, received by an employee, or retain any part of a gratuity or of any charge purported to be a gratuity for an employee. . . . Nothing in this subdivision shall be construed as affecting . . . the sharing of tips by a waiter with a busboy or similar employee."

NYLL § 196-d.

The test for whether an individual is an "employer" forbidden from keeping employee's tips under the FLSA and NYLL is the same as the one used to assess individual liability and the Court considers factors including whether the individual: "(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Carter v. Dutchess Community College*, 735 F.2d 8, 12 (2d Cir.1984); *see Gillian v. Starjem Rest. Corp.*, 2011 WL 4639842, at *4 (S.D.N.Y. Oct. 4, 2011); *Hart*, 2010 WL 5297221, at *2.

Meanwhile, for purposes of the NYLL, the New York Court of Appeals has defined "agents" of an employer or "managers" ineligible for tip pool participation as individuals with "meaningful authority" even if that authority is not necessarily "final authority." *Barenboim v. Starbucks Corp.*, 995 N.E.2d 153, 160 (N.Y. 2013). "Meaningful authority might include the

ability to discipline subordinates, assist in performance evaluations or participate in the process of hiring or terminating employees, as well as having input in the creation of employee work schedules, thereby directly influencing the number and timing of hours worked by staff as well as their compensation." *Id.*; *see Hoxhaj v. Michael Cetta, Inc.*, 2023 WL 3455444, at *6 (S.D.N.Y. May 15, 2023) (discussing the degree of managerial responsibility necessary for an employee to be tip-ineligible).

Courts apply a similar test to determine whether supervisors should be considered the "employer's agents" and thus ineligible for tip pooling under the FLSA. *See Ayres v. 127 Rest. Corp.*, 12 F. Supp. 2d 305, 308 n.1 (S.D.N.Y. 1998) (citing *NLRB v. Big Three Indus. Gas & Equip. Co.*, 579 F.2d 304, 309–10 (5th Cir. 1978) (supervisors who had authority to "interview job applicants, grant time off, allocate overtime work, transfer employees and recommend wage increases" were employer's agents), *cert. denied*, 440 U.S. 960 (1979)); *Gillian*, 2011 WL 4639842, at *4 (denying defendant summary judgment because floor captain participating in tip pooling may have been a manager, given that he interviewed and hired applicants and had the authority to discipline employees and set employee schedules); *Fonseca v. Dircksen & Talleyrand Inc.*, 2014 WL 1487279, at *3 (S.D.N.Y. Apr. 11, 2014) (maître d's could not have been included in the tip pool where they "had the authority to interview, hire, and fire employees and supervised, disciplined, and scheduled employees").

Plaintiffs claim that eight individuals improperly participated in the tip pools: three team leaders at The Bao (Alana Lin,[11] Upendra Shahi, and Sha Kang He[12]) and five team leaders at

---

[11] The parties' exhibits include multiple spellings including Alana Lin, Alanna Lin, and Alan Lin. Dkt. No. 122-40 at 5; Dkt. No. 122-41. The Court understands these names to refer to the same person.
[12] The parties' exhibits include multiple spellings including Sha Kang He and Shaokang He. Dkt. No. 122-40 at 5; Dkt. No. 122-41. The Court understands these names to refer to the same

Uluh (Lu Mei Zhang, Yunrui Du, Suttiprapa Rachata, Yu Tang, and Napatwaran Amnueychotthavee).   Dkt. No. 122-40 at 5; Dkt. No. 122-2; Dkt. No. 122-3.[13]   In addition to Zhang's role as team leader at Uluh from 2017 to 2022, she was also the general manager for both restaurants and was the one who created the tip pooling arrangement at both restaurants. Dkt. No. 138 ¶¶ 20, 69.

Defendants do not dispute that Zhang "was at one point the general manager of the Restaurants" and "acknowledge that the General Manager should not have received tips." Dkt. No. 139 at 1, 27.  That concession is sufficient to determine that Defendants are liable for violating FLSA and the NYLL and to make Defendants ineligible for the tip credit and for withholding tips from Plaintiffs.  *See Shahriar*, 659 F.3d at 240–41.

In order to ultimately determine the sum of damages to which Plaintiffs are entitled in connection with Defendants' tip withholding violations, Dkt. No. 124 at 32, the Court must address the eligibility of the team leaders to participate in the tip pool.  Defendants do not dispute that team leaders received tips from the tip pool at both The Bao and Uluh.  Dkt. No. 138 ¶ 66; Dkt. No. 139 at 9; Dkt. No. 122-8 at 6; Dkt. No. 122-40 at 5.  Defendants claim that "Team Leaders are a separate position from managers," *id.* at 9, such that "Team Leaders, whose roles are integral to the direct service operation, are permitted under the law to participate in the tip pool," *id.* at 1–2.  Defendants also argue that there is a genuine issue of material fact as to whether team

---

person.
[13] Plaintiffs appear to additionally state that Fei Yang Gao was ineligible to participate in tip pooling, Dkt. No. 122-3 at ECF p. 8, but do not give any reason why.  Gao is not among the undisputed team leaders and Plaintiffs do not identify any non-service or management role Gao held.  Plaintiffs also state that Gao did not receive any tips for the single week worked.  *Id.*  As such, summary judgment is denied as to Plaintiffs' claims that Gao unlawfully participated in the tip pool.

leaders should be considered managers because "there were, in fact, other managers at the Restaurants." Dkt. No. 139 at 27.

In *Barenboim*, the New York Court of Appeals found it "evident that employer-mandated tip splitting should be limited to employees who, like waiters and busboys, are ordinarily engaged in personal customer service, a rule that comports with the 'expectation[s] of the reasonable customer.'" *Barenboim*, 995 N.E.2d at 159 (quoting *Samiento v. World Yacht Inc.*, 883 N.E.2d 990, 994 (N.Y. 2008)). Thus, the *Barenboim* Court found reasonable and adopted as a matter of New York law the New York Department of Labor's position that "employees who regularly provide direct service to patrons remain tip-pool eligible even if they exercise a limited degree of supervisory responsibility." *Id.* However, the Court of Appeals rejected the proposition that an employee may participate in the tip pool so long as he does "not have full or final authority to terminate subordinates." *Id.* at 160. It recognized that, short of that, "there comes a point at which the degree of managerial responsibility becomes so substantial that the individual can no longer fairly be characterized as an employee similar to general wait staff within the meaning of [NYLL § 196-d]" and concluded "that the line should be drawn at meaningful or significant authority or control over subordinates." *Id.* at 160. "[T]he power to hire and fire is not the exclusive test" but instead meaningful authority includes such powers and responsibilities as (1) disciplining subordinates, (2) assisting in performance evaluations, (3) participating in the process of hiring or terminating employees, and (4) providing input in the creation of employee work schedules, thereby directly influencing hours worked and compensation. *Id.*

Defendants concede that the team leaders possessed three of those four enumerated authorities (there is no evidence team leaders assisted in performance evaluations) as well as additional authorities. Dkt. No. 138 ¶ 67 (It is undisputed that team leaders' responsibilities

"included, but were not limited to hiring, firing, discipling, scheduling, promoting, determining tip percentages for employees, handling the tip sheet, accessing company email accounts, and creating policies and the handbook."); Dkt. No. 139 at 9 (same); Dkt. No. 122-4 at 75:7–21 (Lam testified team leaders' responsibilities include scheduling, tip sheets, customer complaints, disciplining, firing, and hiring), 79:15–81:16 (same).  In addition to their scheduling abilities, the fact that team leaders were involved in "determining tip percentages for employees" meant the team leaders had even more involvement in determining other employees' compensation.  *See Marzovilla v. N.Y. State Indus. Bd. of Appeals*, 8 N.Y.S.3d 681, 683 (3d Dep't 2015) (testimony that employee impacted tip pool division was properly credited to establish that employee's meaningful authority because it established that he directly influenced the compensation received by other waiters, in addition to his own).  In sum, the team leaders' undisputed responsibilities constitute meaningful supervisory authority that render them ineligible for participation in the tip pool.  *See Condado v. P&C Pagels, Inc.*, 2023 WL 7686701, at *8 (E.D.N.Y. Sept. 27, 2023) ("Because Linda Abatangelo had the ability to discipline, hire, and terminate employees, as well as create the employees' schedules, pursuant to the *Barenboim* test, she had meaningful authority over subordinates and was not eligible to take a portion of the tips."); *Fonseca*, 2014 WL 1487279, at *3; *Vazquez v. 142 Knickerbocker Enters., Corp.*, 2024 WL 1191157, at *13 (E.D.N.Y. Mar. 20, 2024).

Even if team leaders were involved in service, their managerial role would preclude participation in the tip pool.  *See Barenboim*, 995 N.E.2d at 160 (holding that employees who possess "limited supervisory responsibilities" but not those "granted meaningful authority or control over subordinates" can participate in employer-mandated tip pool if they provide personal service to patron as "a principal or regular part" of their duties).  "[T]he practice of forced sharing

of tips with management is such an illegal practice, regardless whether or not the members of management were engaged in restaurant services that could be the subject of tipping." *Chung v. New Silver Palace Rest., Inc.*, 246 F. Supp. 2d 220, 229 (S.D.N.Y. 2002) (granting summary judgment to plaintiffs because tip pool was unlawful where floor managers who "performed traditional service functions such as seating customers, delivering food and clearing tables" participated in the tip pool); *see also Paguay v. Buona Fortuna, Inc.*, 2013 WL 3941088, at *3 (S.D.N.Y. July 31, 2013) (granting plaintiffs summary judgment because tip pooling was still unlawful where employers "shared in the tip pool only on days when they provided direct customer service at the restaurant and so acted as traditionally tipped employees"); *Abe v. Uezu Corp.*, 2023 WL 2574050, at *7 (S.D.N.Y. Mar. 18, 2023) (granting summary judgment for plaintiff because it does not matter "for purposes of the NYLL, that [employer] engaged in some traditionally tipped work"); *Han, v. Interexchange, Inc.*, 2024 WL 3990770, at *19 (S.D.N.Y. Aug. 28, 2024) (Plaintiffs have stated an unlawful-retention claim where employer and managers participated in the tip pool even though the employer and managers "also engaged in tipped work.").

It is also of no import that there were other managers at the restaurant. Both the FLSA and NYLL permit a finding that there are multiple employers. *See Feng v. Kelai Corp.*, 2024 WL 1348654, at *7 (S.D.N.Y. Mar. 29, 2024). Defendants identify Zhang, Yunrui Du, and Upendra Shahi as the intermediate managers supposedly above the team leads but below Lam. Dkt. No. 139 at 17, 27; Dkt. No. 138 ¶ 64. Defendants do not dispute that those three individuals were also team leaders. *Id.* ¶ 65. Any additional authority they may have wielded as managers does not change the determination that neither they nor the other team leaders were eligible to participate in the tip pools.

Defendants have not raised any dispute of material fact regarding their liability for unlawful tip pooling, and the Court therefore grants summary judgment.

Plaintiffs additionally ask the Court to grant summary judgment on the question of damages for the misappropriated tips. Dkt. No. 124 at 32. However, Plaintiffs' damage calculations do not properly discount the damages for misappropriated tips owed to the employees who opted out. *Id. See Murphy*, 2019 WL 12536881, at *2 & n.1; *see also Hickory Sec. Ltd.*, 493 F. App'x at 160. Summary judgment is accordingly denied as to damages.

## VI.    Uniform Requirements

"New York law dictates that '[w]hen an employee purchases a required uniform, he or she shall be reimbursed by the employer for the total cost of the uniform no later than the next payday.'" *Amaya*, 2024 WL 2136044, at *6 (quoting 12 N.Y.C.R.R. § 146-1.8(a)).[14]

There is no actual dispute that Defendants violated this policy. The Bao required tipped workers to wear uniform tops and charged workers $10 to $15 for the uniforms as a "deposit." Dkt. No. 138 ¶ 85. Uluh also required tipped workers to wear uniform tops and the "deposit" is believed to be about $20. *Id.* ¶ 86.[15] Defendants did not reimburse employees the following day and instead had a policy that deposits would be returned to employees after the return of the uniforms. Dkt. No. 138 ¶ 87. This policy was not communicated to all Plaintiffs. *Id.* ¶ 88; Dkt. No. 122-26 at 47:21–24. Not all Plaintiffs who returned their uniforms received their deposit back. Dkt. No. 138 ¶ 89; Dkt. No. 122-25 at 102:7–11; Dkt. No. 122-11 at 21:5–23:10.

---

[14] Federal law additionally mandates that an employer cover uniform costs when "the employees' expenditures for these purposes would reduce their wages to below minimum wage." *Ayres v. 127 Rest. Corp.*, 12 F.Supp.2d 305, 310 (S.D.N.Y.1998); 29 U.S.C. § 206. On this summary judgment motion, Plaintiffs do not argue Defendants' uniform policy violated federal law. Dkt. No. 124.

[15] Lam testified he believed the deposit to be around $20. Dkt. No. 122-4 at 213:19–23. A few Plaintiffs testified that the deposit was closer to $25 at least for the first few uniforms. Dkt. No. 122-10 at 60:14–61:5; Dkt. No. 122-26 at 46:19–47:2. Ultimately this difference is immaterial to the question of liability.

Defendants offer no defense other than the argument that they made "a good faith effort to comply with the NYLL by way of their return policy."  Dkt. No. 139 at 28.  Good faith is not a defense to violation of the uniform reimbursement requirement.  *See* NYLL § 198.

Accordingly, Defendants are liable to Plaintiffs for the amounts expended on the uniforms. *See Salinas*, 123 F. Supp. 3d at 476.

## VII.    Wage Notices and Wage Statements

The New York State Legislature passed the Wage Theft Prevention Act, 2010 N.Y. Sess. Laws 1446-58 ("WTPA"), in an effort "to expand the rights of employees to seek civil and criminal avenues of remedy" against employers who violate the labor law.  *See* N.Y. Spons. Memo., 2010 S.B. 8380 (Oct. 28, 2010); *Copper v. Cavalry Staffing, LLC*, 132 F. Supp. 3d 460, 466 (E.D.N.Y. 2015).  The Legislature noted that "[s]tudies indicate that a large number of employees are earning less than minimum wage and others are being paid less than their correct wage[;] [m]any employees are also not all receiving the appropriate amount of overtime compensation and many employers are failing to adequately inform their employees of their wages and how they are calculated in a language they can comprehend."  N.Y. Spons. Memo., 2010 S.B. 8380.  "In an effort to combat these abuses, the WTPA was drafted to 'dramatically' increase the penalties against employers 'in order to far better protect workers' rights and interests.'"  *Copper*, 132 F. Supp. 3d at 468 (E.D.N.Y. 2015) (quoting N.Y. Spons. Memo., 2010 S.B. 8380).

Plaintiffs claim that Defendants either failed to provide wage notices and wage statements or provided deficient notices and statements in violation of Sections 195(1)(a) and (3) of the NYLL which were adopted as part of the WTPA.  Dkt. No. 124 at 35.

Section 195(1)(a) of the NYLL "requires an employer to provide an employee, at the time of hiring, with a notice (1) describing the employee's rate of pay for regular and for overtime hours; (2) stating whether the employer intends to credit allowances for items such as tips, meals,

and lodging toward the employee's minimum wage; (3) describing certain health care benefits; and (4) providing other basic information." *Guthrie v. Rainbow Fencing Inc.*, 2024 WL 3997427, at *1 (2d Cir. Aug. 30, 2024) (citing NYLL § 195(1)(a)).  Failure to provide proper notices gives rise to statutory damages of $50 per employee per day with a maximum recover of $5000 per employee.  NYLL § 198(1-b); *see Dominguez v. Metro. Wireless Anandpur Inc.*, 2022 WL 1164709, at *8 (S.D.N.Y. Jan. 27, 2022), *report and recommendation adopted*, 2022 WL 421126 (S.D.N.Y. Feb. 11, 2022).

After hiring, Section 195(3) of the NYLL additionally requires an employer to "furnish each employee with a wage statement with every payment of wages," listing several details, including, the employer's name, address, and telephone number, any allowances taken, deductions, gross wages, net wages, and, for nonexempt workers, the employee's hourly rate or rates of pay and the correct number of regular and overtime hours the employee worked.  NYLL § 195(3); *Gamero*, 272 F. Supp. 3d at 511 (quoting NYLL § 195(3)).  The wage notice requirements are intended to assist employees seeking to vindicate their rights and ensure they receive accurate and lawful pay.  N.Y. Spons. Memo., 2010 S.B. 8380.  The requirements in Section 195(3) are therefore applied strictly and "[w]age statements must . . . contain all data identified by NYLL § 195(3)."  *Ametepe v. Peak Time Parking, Corp.*, 2021 WL 1172669, at *7 (S.D.N.Y. Mar. 29, 2021); *see Shen*, 2018 WL 6712771, at *9; *Rodriguez v. Avondale Care Grp., LLC*, 2018 WL 1582433, at *8 (S.D.N.Y. Mar. 27, 2018); *Green v. Humana At Home, Inc.*, 380 F. Supp. 3d 400, 416 (S.D.N.Y. 2019) (Nathan, J.).  "For violations of [NYLL] § 195(3), an employee may recover $250 for each workday the violations occurred not to exceed $5,000, with costs and reasonable attorney's fees."  *Garcia v. Three Decker Rest., Ltd.*, 2024 WL 1311897, at *8 (S.D.N.Y. Mar. 27, 2024) (citing NYLL § 198(1-d)).

Before the Court may proceed to the merits of Plaintiffs' notice claim, the Court must determine that it has jurisdiction, including that Plaintiffs have demonstrated injury-in-fact. *See Lance v. Coffman*, 549 U.S. 437, 439 (2007). A recent Second Circuit decision, *Guthrie v. Rainbow Fencing Inc.*, calls that standing into question. 2024 WL 3997427.

In *Guthrie*, the Second Circuit held that plaintiffs pursuing NYLL claims for failure to provide wage notices and wage statements cannot predicate standing purely on the fact that the WPTA "grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Id.* at *5 (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 426 (2021)); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016). Thus, "a plaintiff must show some causal connection between the lack of accurate notices and [a] downstream harm," such as the plaintiff's impaired ability to seek relief for violations about which they may not have information or a lack of proper documentation to apply for public benefits. *Id.* at *5–6; *see also id.* at *5 ("The legislature may have intended to empower employees to advocate for themselves, but unless the plaintiff-employee can show that he or she would have undertaken such advocacy and plausibly would have avoided some actual harm or obtained some actual benefit if accurate notices had been provided, the plaintiff-employee has not established a concrete injury-in-fact sufficient to confer standing to seek statutory damages under § 195.").

Plaintiffs do not identify any concrete injury suffered as a result of the deficient wage notices and statements, and therefore summary judgment is denied on that ground. *See Villada v. Grand Canyon Diner*, 2024 WL 3875778, at *10 (E.D.N.Y. Aug. 19, 2024) (denying plaintiff's motion for partial summary judgement where plaintiff "failed to show a concrete injury to provide her with Article III standing for her wage notice and wage statement claims").

## VIII.    Affirmative Defense of Good Faith

Both the FLSA and NYLL provide for liquidated damages in addition to actual damages. 29 U.S.C. §§ 216(b); NYLL § 663(1).[16]

"Under the FLSA, a district court is generally required to award a plaintiff liquidated damages equal in amount to actual damages" for unpaid minimum wages, unpaid overtime compensation, unlawful tip credit, and tip seizure. *Barfield*, 537 F.3d at 150; 29 U.S.C. § 216(b). Courts have "discretion to deny liquidated damages where the employer shows that, despite its failure to pay appropriate wages, it acted in subjective 'good faith' with objectively 'reasonable grounds' for believing that its acts or omissions did not violate the FLSA." *Barfield*, 537 F.3d at 150 (quoting 29 U.S.C. § 260).   But, as Judge Failla has noted, "this is a tough row to hoe." *Gamero*, 272 F. Supp. 3d at 502.   "To establish the requisite subjective 'good faith,' an employer must show that it took 'active steps to ascertain the dictates of the FLSA and then act to comply with them.'"   *Barfield*, 537 F.3d at 150 (quoting *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 142 (2d Cir. 1999)); *see Brock v. Wilamowsky*, 833 F.2d 11, 19 (2d Cir. 1987).   "The employer bears the burden of proving good faith and reasonableness, but the burden is a difficult one, with double damages being the norm and single damages the exception." *Herman*, 172 F.3d at 142; *see also Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 310 (7th Cir. 1986) (Easterbrook, J.) ("Doubling [damages under FLSA] is not some disfavored 'penalty.'   The [Portal–to–Portal Act] made doubling discretionary rather than mandatory, but it left a strong presumption in favor of doubling, a presumption overcome only by the employer's 'good faith . . . and reasonable grounds for believing that [the] act or omission was not a violation.'").

---

[16]   The Court notes, however, that "a plaintiff cannot simultaneously recover liquidated damages under both statutes." *Gamero*, 272 F. Supp. 3d at 503; *see Rana v. Islam*, 887 F.3d 118, 123 (2d Cir. 2018) ("We . . . interpret the NYLL and FLSA as not allowing duplicative liquidated damages for the same course of conduct.").

Under the NYLL, liquidated damages in an amount equal to actual damages are similarly presumed unless the employer proves good faith. *Garrido v. F&M Const. and Dev. Corp.*, 2024 WL 3964695, at *28 (S.D.N.Y. Aug. 28, 2024); NYLL § 198(1-a). Courts generally apply the federal good faith standard to NYLL claims. *See Inclan*, 95 F. Supp. 3d at 505 (collecting cases); *Leevson v. Aqualife USA Inc*, 770 F. App'x 577, 583 (2d Cir. 2019) (summary order) (assuming "that the standard is the same under the NYLL").

It is the obligation of Defendants, as the party with the burden of proof on the affirmative defense, to proffer "some evidence permitting a reasonable juror to find in its favor" on the issue of good faith. *See In re 650 Fifth Ave.*, 830 F.3d at 97 n.29. Defendants have not done so and Plaintiffs are entitled to summary judgment.

It is undisputed that Defendants did not reach out to or retain any employment-specific attorney to set up employment practices or to review or audit their practices while in operation. Dkt. No. 138 ¶ 100. Defendants also did not retain anyone to review their employment practices after they were sued by an employee for owed wages in 2020. *Id.* ¶¶ 103–104; Dkt. No. 122-51. Following that suit, Defendants also did not alter the wage form used for tipped workers or remove team leaders from the tip pool. Dkt. No. 138 ¶ 105.

Lam, in his individual and corporate capacity, testified that he had developed a general understanding of the FLSA from "the internet" and of the NYLL from the restaurants' accountant. Dkt. No. 122-4 at 222:15–223:10. But Defendants do not identify what Lam saw on the internet or heard from his accountant. Dkt. No. 139. Consulting with an accountant or doing online research cannot establish Defendants' good faith in the absence of evidence regarding any communicated information which could have led him to believe that Defendants' labor practices complied with the FLSA and NYLL. *See Copantitla*, 788 F. Supp. 2d at 317 (Defendants failed

to create a genuine issue of material fact as to good faith defense where "Defendants point to no advice that the accountant with whom [the manager] consulted gave them that would have led them to think that that either their failure to inform employees that they were taking a tip credit or their failure to calculate overtime properly were legal"). Mere ignorance of the law does not show a good faith attempt to comply with the law. *See Frazier v. FCBC Cmty. Dev. Corp.*, 2024 WL 1342802, at *2 (S.D.N.Y. Mar. 29, 2024) (granting plaintiff summary judgment on liquidated damages due to defendant's failure to show evidence of good faith effort to comply); *Hwangbo*, 2023 WL 2710669, at *14 (same).

Defendants claim that after the instant suit was filed, "Plaintiffs began to receive copies of both the Timecard Paystubs and Paycheck Paystubs." Dkt. No. 138 ¶ 102. The evidence cited in support is a document showing one Plaintiff's paystubs and deposition excerpts in which two other Plaintiffs testified that they began to receive the documents after the lawsuit was filed. Dkt. No. 122-46; Dkt. No. 122-16 at 26:11–28:4, 49:18–24; Dkt. No. 122-18 30:16–33:8.[17] These documents do not rebut Defendants' lack of good faith. The paystubs submitted as supporting evidence are still noncompliant as they do not record the employee's regular and overtime hours worked or regular and overtime wage. Dkt. No. 122-46; NYLL § 195(3); *see supra*. Defendants do not argue—let alone provide evidence—that they had a good faith belief the new paystubs complied with their legal obligations. Defendants thus have not demonstrated how this supposedly ameliorative step shows "active steps to ascertain the dictates of the FLSA [or the NYLL] and then act to comply with them." *Reich*, 121 F.3d at 71. Defendants also do not claim that the documentary changes were accompanied by any change in the numerous other complained-of pay

---

[17] Plaintiffs do not dispute that Plaintiffs began to receive copies of the documents after the lawsuit was filed. Dkt. No. 138 ¶ 97.

procedures.  Dkt. No. 139.  Thus, even if the Defendants did demonstrate "objectively reasonable grounds for believing that [the wage statements] were in compliance with the FLSA [and NYLL]," *Herman*, 172 F.3d at 142, that good faith would only pertain to the notice claims under NYLL § 195 (for which the Court does not grant summary judgment, *supra*) and Defendants still would not have shown any effort to ascertain or comply with the NYLL and FLSA requirements governing the remaining claims for minimum wage violations, unpaid tips, and unlawful uniform policy.

Defendants have not offered any grounds on which a reasonable jury could find that Defendants had "good faith basis to believe that [their] underpayment of wages was in compliance with the law."  *Rana*, 887 F.3d at 123; *see also Garcia v. JonJon Deli Grocery Corp*., 2015 WL 4940107, at *6 (S.D.N.Y. Aug. 11, 2015) (granting plaintiff summary judgment on liquidated damages due to defendant's failure to show evidence of good faith); *Inclan*, 95 F. Supp. 3d at 504 (same); *Barfield*, 537 F.3d at 151 (affirming same).  Defendants therefore are unable to show their good faith affirmative defense and summary judgment is granted to Plaintiffs.

## IX.    **Leniency**

Defendants raise a final policy argument:  "It is important to underscore that this case is not simply about legal technicalities but rather the survival of small businesses under the stringent, sometimes unmanageable legal standards that can cripple their operations."  *Id.* at 1.  Defendants therefore request leniency, arguing that "there are only a handful of small businesses that can strictly comply with every stringent requirement of the FLSA and NYLL, and remain . . . viable economically speaking."  *Id.* at 31.  The argument fails to persuade.

The FLSA is a cornerstone of U.S. labor policy.  29 U.S.C. § 201, *et seq.*[18]  As the United States Supreme Court has noted, "the prime purpose of the legislation was to aid the unprotected, unorganized and lowest paid of the nation's working population; that is, those employees who lacked sufficient bargaining power to secure for themselves a minimum subsistence wage." *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707 n.18 (1945).  In pursuit of those protective aims, the FLSA imposes baseline standards for the minimum wages an employer may pay and maximum hours an employee may be required to work.  *See id.* at 707; *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 292 (1960).  But the FLSA does not singularly protect employees' interests.  A report prepared for the U.S. Department of Labor in 2014 noted that beyond the "impacts to individuals, lack of compliance with the FLSA results in lower income and employment tax payments from employers and employees, thus affecting programs like Social Security and Medicare."  *The Social And Economic Effects Of Wage Violations: Estimates for California and New York*, Eastern Research Group, Inc., https://www.dol.gov/sites/dolgov/files/OASP/legacy/files/WageViolationsReportDecember2014.pdf.  Furthermore, permitting some small businesses to engage in unfair employment practices while others pay the increased costs associated with FLSA-compliant employee remuneration essentially amounts to permitting violators to engage in unfair competition.  *See Roland Elec. Co. v. Walling*, 326 U.S. 657, 670 (1946) (to achieve the aim of "rais[ing] living standards," the FLSA "has sufficiently broad coverage to eliminate in large measure from interstate commerce the competitive advantage accruing from savings in costs based upon substandard labor conditions").

---

[18] The National Labor Relations Act, or Wagner Act, 29 U.S.C. § 151 *et seq.*, serves as an additional cornerstone.

In sum, while small businesses such as Defendants may feel they have gotten the short end of the stick, the FLSA "is remedial and humanitarian in purpose" and "must not be interpreted or applied in a narrow, grudging manner." *Tenn. Coal, Iron & R. Co. v. Muscoda Loc. No. 123*, 321 U.S. 590, 597 (1944). "We are not here dealing with mere chattels or articles of trade but with the rights of those who toil, of those who sacrifice a full measure of their freedom and talents to the use and profit of others. Those are the rights that Congress has specially legislated to protect." *Id.*

New York has gone beyond the FLSA by providing even further protections for employees, such as a higher minimum wage and the aforementioned more stringent notice requirements. *See Sevilla v. House of Salads One LLC*, 2022 WL 954740, at *5 (E.D.N.Y. Mar. 30, 2022); *History of the Minimum Wage in New York State*, N.Y. Dep't of Lab., https://dol.ny.gov/history-minimum-wage-new-york-state; NYLL § 195. Recently, New York took further legislative action to proscribe minimum wage violations. In 2023, the legislature expanded the statutory definition of "property" associated with larceny to include "compensation for labor or services." N.Y. Pen. Law § 155.00. The amendment's sponsor explained that doing so would permit "prosecutors to seek stronger penalties against employers who steal wages from workers." N.Y. Spons. Mem., 2023 S.B. 2832 (Feb. 9, 2023). The Sponsor's Memorandum stated:

> Wage theft is a form of worker exploitation, akin to labor trafficking and other violations of employees' rights. Its perpetrators take advantage of some of our communities' most vulnerable populations, including undocumented immigrants and low-income workers, who often are not empowered to stand up for themselves. According to Cornell University's Worker Institute, wage theft in New York accounts for nearly $1 billion in lost wages each year and affects tens of thousands of workers[;] that's close to $20 million per week.

*Id.* The Sponsor's Memorandum further acknowledged many of the same society-wide interests in enforcing labor standards that underlie the FLSA apply in as full force to the NYLL: "By committing wage theft and associated frauds, these companies unfairly lower their costs, making it nearly impossible for law-abiding businesses to compete." *Id.* "And every taxpayer shoulders

the effects of wage theft because when the workers are underinsured, it forces government to step in and incur costs that should have been borne by their employer." *Id.*

Ultimately, Defendants' argument that their "efforts should not be overlooked, as it is probably more than what the majority of small restaurant owners have done to comply with the FLSA and NYLL," Dkt. No. 139 at 31, is a recipe for anarchy. All employers are expected to comply with the FLSA and NYLL and many do so, often at great expense. But they do so because that is the balance that the federal and state legislatures have struck between the interests of employers and those of employees and in recognition of the costs imposed on society as a whole when employees are underpaid. It may be that for some employers the expense is too great and they are unwilling to pay it. But the Court cannot and will not excuse their failure to comply with FLSA and the NYLL on the grounds that it conforms "with industry-wide practice," *Reich.*, 121 F.3d at 71 (citing *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 909 (3d Cir. 1991)), without giving license to every employer to disregard the law. The FLSA and NYLL were enacted (and have been amended throughout the years) based on the judgment that they were necessary to defend not only employees but also other businesses and the citizenry at large from employers' exploitative pay practices. The Court cannot disregard that legislative command.[19]

---

[19] Defendants additionally claim that the FLSA and NYLL "have been increasingly used as tools by certain opportunistic parties not to correct genuine grievances but to extract unwarranted settlements from small to medium-sized businesses, thereby jeopardizing their viability and the employment they provide," and "this is exactly why FLSA wage and hour lawsuits have risen 417% between 1997 and 2017." Dkt. No. 139 at 2 (citing *FLSA Wage and Hour Lawsuits Are Up 417%*, Intuit QuickBooks, https://quickbooks.intuit.com/time-tracking/flsa-research-tool/). The Court notes that this phenomenon may be less cynically explained by new and strengthened worker protections, such as notice requirements, that better alert employees to their rights and permit them to seek the wages to which they are entitled. *See, e.g.*, 2010 N.Y. Sess. Laws. Ch. 564 (McKinney) (amending NYLL § 195 to expand wage notice requirements to ensure, *inter alia*, employees are informed of their rates of pay, pay schedule, and any allowances the employer intends to claim as part of the minimum wage).

## CONCLUSION

Plaintiffs' motion for summary judgment is granted in part and denied in part.  Defendants'

motion for partial summary judgment is denied.

The Clerk of Court is respectfully directed to close Dkt. Nos. 121 and 125.


SO ORDERED.


Dated: October 22, 2024
     New York, New York           _____
                                   LEWIS J. LIMAN
                         United States District Judge